JEFFERSON GARDEN ASSOCIATES *v.* DORIS GREENE (12572)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

Argued November 5, 1986—decision released January 27, 1987

*Frances S. Taylor,* with whom, on the brief, was *John C. Wirzbicki,* for the appellant (defendant).

*Glenn T. Terk,* with whom, on the brief, was *John P. Zanini,* law student intern, for the appellee (plaintiff).

PETERS, C. J. This case concerns the legal sufficiency of various notices sent by a landlord in order to terminate the lease of a tenant occupying federally subsidized housing. The plaintiff, Jefferson Garden Associates, brought a summary process action pursuant to General Statutes §§ 47a-23[1] and 47a-15[2] against the defend-

---

[1] At all relevant times, General Statutes § 47a-23 provided: "NOTICE TO QUIT POSSESSION OF PREMISES. FORM. SERVICE. (a) When a rental agreement or lease of any land or building or of any apartment in any building, or of any dwelling unit, or of any trailer, or any land upon which a trailer is used or stands, whether in writing or by parol, terminates by lapse of time, or by reason of any expressed stipulation therein, or under the provisions of section 47a-15a, or as a result of a violation of section 47a-11, or where such premises, or any part thereof, is occupied by one who has no right or privilege to occupy such premises, or where one originally had the right or privilege to occupy such premises but such right or privilege has terminated, and the owner or lessor, or his legal representatives, or his attorney-at-law, or in-fact, desires to obtain possession or occupancy of the same, at the termination of the rental agreement or lease, if any, or at any subsequent time, he or they shall give notice to the lessee or occupant to quit possession of such land, building, apartment or dwelling unit, at least eight days before the termination of the rental agreement or lease, if any, or before the time specified in the notice for the lessee or occupant to quit possession or occupancy.

"(b) The notice shall be in writing substantially in the following form: 'I (or we) hereby give you notice that you are to quit possession or occupancy of the (land, building, apartment or dwelling unit, or of any trailer or any land upon which a trailer is used or stands, as the case may be), now occupied by you, on or before the (here insert the date) for the following reasons (here insert the reason or reasons for the notice to quit possession or occupancy, also the date and place of signing notice). A.B.'

"(c) A copy of such notice shall be delivered to the lessee or occupant or left at his place of residence or, if the rental agreement or lease concerns commercial property, at the place of the commercial establishment by a proper officer or indifferent person."

[2] At all relevant times, General Statutes § 47a-15 provided: NONCOMPLIANCE BY TENANT. LANDLORD'S REMEDIES. Except in the case in which the landlord elects to proceed under sections 47a-23 to 47a-23b, inclusive, to evict based on nonpayment of rent or based on conduct by the tenant which

ant, Doris Greene, to recover possession of the leased premises because of the defendant's noncompliance with a no pets clause in her lease. The trial court ruled in the plaintiff's favor both on the plaintiff's own cause of action and on the defendant's five special defenses. The defendant has appealed.

The relevant facts are largely undisputed. On December 30, 1978, the plaintiff and the defendant entered into a written one year lease for the use and occupancy of an apartment at 87F Michael Road in New London. Despite the unequivocal prohibition of article 11 (g) of the lease, in which the tenant agreed "to have no animals or pets of any kind on the premises unless expressly permitted in writing by the LANDLORD," the defendant continues, without permission, to keep a doberman pinscher in her apartment. The defendant claims that she needs a dog for security reasons. The 1978 lease containing the no pets clause has not been formally renewed by the parties. That lease, however, contained a provision for automatic renewal, entitled "Termination and Renewal," which stated: "Unless terminated or modified as provided herein, this Agreement shall be automatically renewed for successive terms of

is illegal, if there is a material noncompliance with section 47a-11 which materially affects the health and safety of the other tenants or materially affects the physical condition of the premises, or if there is a material noncompliance by the tenant with the rental agreement or a material noncompliance with the rules and regulations adopted in accordance with section 47a-9, the landlord may deliver a written notice to the tenant specifying the acts or omissions constituting the breach and that the rental agreement shall terminate upon a date not less than thirty days after receipt of the notice. If such breach can be remedied by repair by the tenant or payment of damages by the tenant to the landlord, and such breach is not so remedied within twenty-one days the rental agreement shall terminate except that (1) if the breach is remediable by repairs or the payment of damages and the tenant adequately remedies the breach within such twenty-one day period, the rental agreement shall not terminate; or (2) if substantially the same act or omission for which notice was given recurs within six months, the landlord may terminate the rental agreement in accordance with the provisions of sections 47a-23 to 47a-23b, inclusive."

one month each at the foresaid rental, subject to adjustment as herein provided. The TENANT shall execute a new lease at the end of the initial term, if requested."

The plaintiff undertook to have the defendant either correct her violation of the no pets clause of her lease or vacate her apartment. To that end, the plaintiff sent the defendant three separate termination notices that specifically instructed the defendant that she risked eviction because of her material noncompliance with the no pets clause. These notices detailed timetables within which she might take remedial action or voice objections to the threatened eviction proceedings. When, despite her receipt of these notices, the defendant failed to reply to the warnings they contained, the plaintiff served her with a notice to quit possession and thereafter brought a summary process action seeking immediate possession of the leased premises.

In response to the plaintiff's summary process action, the defendant filed an answer and several special defenses. She questioned the enforceability of the no pets clause and claimed that the notices sent by the plaintiff did not comply with applicable state and federal statutes and regulations.

The trial court found all the issues in favor of the plaintiff. The court concluded that the no pets clause continued to be binding upon the defendant, even though her lease had not been renewed formally, because her original lease had automatically been renewed by its own terms. The court furthermore concluded that the defendant's concerns about security in the apartment complex did not suffice to permit her to keep a dog in violation of the explicit no pets clause in her lease. These conclusions, which are unchallenged in the defendant's appeal to this court, establish that the defendant was in material noncompliance with the terms of her lease and that the plaintiff therefore had good cause for termination of the lease.

The trial court also concluded that the plaintiff had sent the defendant the termination notices required by state and federal law. The applicable principles of Connecticut law are codified in General Statutes § 47a-23, and the procedures that are required for a valid eviction are set forth in General Statutes § 47a-15. In addition, a landlord who seeks to evict a tenant from the Michael Road apartment complex must comply with the applicable federal regulations. These regulations apply because the apartments are part of a low income housing project that was originally constructed with the assistance of a mortgage provided pursuant to section 236 of the National Housing Act; 12 U.S.C. § 1715z-1;[3] and that currently receives rent subsidies under section 8 of the Housing and Community Development Act of 1974. 42 U.S.C. § 1437f.[4] Under federal law, a landlord seeking to evict a tenant from federally subsidized

---

[3] 12 U.S.C. § 1715z-1 (a) provides: "RENTAL AND COOPERATIVE HOUSING FOR LOWER INCOME FAMILIES. AUTHORIZATION FOR PERIODIC INTEREST REDUCTION PAYMENTS ON BEHALF OF OWNER OF RENTAL HOUSING PROJECT. (a) For the purpose of reducing rentals for lower income families, the Secretary is authorized to make, and to contract to make, periodic interest reduction payments on behalf of the owner of a rental housing project designed for occupancy by lower income families, which shall be accomplished through payments to mortgagees holding mortgages meeting the special requirements specified in this section."

[4] 42 U.S.C. § 1437f provides in relevant part: "LOWER-INCOME HOUSING ASSISTANCE. (a) AUTHORIZATION FOR ASSISTANCE PAYMENTS. For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing, assistance payments may be made with respect to existing, newly constructed, and substantially rehabilitated housing in acccordance with the provision of this section.

"(b) AUTHORIZATION FOR CONTRACTS FOR ASSISTANCE PAYMENTS; EXISTING DWELLINGS. . . . (1) The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section. In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section."

apartments must send such a tenant a section 236 termination notice that complies with the requirements of 24 C.F.R. § 450.4 (a)[5] (now § 247.4 [a]) and a section 8 eviction notice that complies with the requirements of 24 C.F.R. §§ 886.101 and 886.128.[6] The 1978 lease

[5] 24 C.F.R. § 450.4 (a) (now § 247.4 [a]) provides: "TERMINATION NOTICE. (a) REQUISITES OF TERMINATION NOTICE. The landlord's determination to terminate the tenancy shall be in writing and shall: (1) State that the tenancy is terminated on a date specified therein; (2) state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense; (3) advise the tenant that if he or she remains in the leased unit on the date specified for termination, the landlord may seek to enforce the termination only by bringing a judicial action, at which time the tenant may present a defense; and (4) be served on the tenant in the manner prescribed by paragraph (b) of this section." 24 C.F.R. § 450 was redesignated as 24 C.F.R. § 247 in 1984. See 49 Fed. Reg. 6713 (1984).

[6] 24 C.F.R. § 886.101 provides: "APPLICABILITY. (a) The policies and procedures contained herein are applicable to the making of Housing Assistance Payments on behalf of Eligible Families in eligible projects under Section 8 Project commitments pursuant to provisions of section 8 of the U.S. Housing Act of 1937 ('Act'). As used in this part, 'Project' or 'Eligible Project' means any existing subsidized or unsubsidized multifamily residential project which is subject to a mortgage insured pursuant to any section of the National Housing Act, any such project the mortgage for which has been assigned to the Secretary, any such project acquired by the Secretary and thereafter sold under a Secretary-held purchase money mortgage, or a project for the elderly financed under Section 202 of the Housing Act of 1959.

"(b) Since HUD, as part of its loan management activities, is responsible for most of the activities assigned to a PHA in the Section 8 Existing Housing program, duplicative PHA activities are not required. However, because of the PHAs' expertise in connection with evictions, the PHA will be invited to perform the function of authorization of evictions, for an agreed fee. In addition, the PHA may be invited to perform inspections of dwelling units, on a fee basis, if HUD determines that such inspections will be performed more efficiently and economically by the PHA. The Contract will be directly between HUD and the Owner, with the PHA as a party for the purpose of supervising evictions and for such other purposes as may be negotiated.

"(c) The primary goal of the Section 8 Loan Management Set-Aside Program is to reduce claims on the Department's insurance fund by aiding those FHA-insured or Secretary-Held projects with immediately or potentially serious financial difficulties. A first priority should be given to projects with presently serious financial problems, which are likely to result in a claim on the insurance fund in the near future. To the extent resources remain

stipulated, in article 4 (b), that the landlord's right to terminate would be governed by 24 C.F.R. § 450.

The trial court determined that the plaintiff had complied with these notice requirements by virtue of the three separate termination notices that were introduced into evidence at trial. The plaintiff, on April 12, 1983, sent the the defendant a "notice of good cause" informing her that her violation of article 11 (g) of the lease forbidding pets, unless remedied, constituted cause for termination of her occupancy of the premises.[7]

---

available, assistance also may be provided to projects with potentially serious financial problems which, on the basis of financial and/or management analysis, appear to have a high probability of producing a claim on the insurance fund within approximately the next five years."

24 C.F.R. § 886.128 provides: "EVICTIONS. (a) The Owner shall not evict the Family unless the Owner complies with the requirements of local law, if any, and of this section. The Owner shall give the Family a written notice of the proposed eviction, stating the grounds and advising the Family that it has 10 days (or such greater number, if any, that may be required by local law) within which to respond to the Owner.

"(b) Where a PHA is a party to the Contract between the Owner and HUD, the Owner must obtain the PHA's authorization for an eviction; accordingly, a copy of the notice shall be furnished simultaneously to the PHA, and the notice shall also state that the Family may, within the same time period, present its objections to the PHA in writing or in person. The PHA shall forthwith examine the grounds for eviction and shall authorize the eviction unless it finds the grounds to be insufficient under the Lease. The PHA shall notify the Owner and the Family of its determination within 20 days of the date of the notice to the Family, whether or not the Family has presented objections to the PHA. If the Owner has not received a response from the PHA within 20 days, he shall telephone the PHA and shall be informed by the PHA whether a notice of determination has been mailed. If the PHA informs the Owner that no notice has been mailed within the 20-day period, the PHA shall be deemed to have authorized the eviction. The PHA shall be entitled to a fee as provided in the Contract for each proposed eviction action submitted by the Owner and reviewed by the PHA."

[7] Exhibit B reads as follows:

"NOTICE OF GOOD CAUSE

"To: Doris Greene
    87F Michael Rd.
    New London, CT 06320

"You are hereby notified that the following conduct on your part shall

That same date,[8] the plaintiff sent the defendant a second notice, denominated a notice pursuant to General Statutes § 47a-15, which again informed the defendant that, because of her dog, she was in material noncompliance with article 11 (g) of her lease. That notice set May 12, 1983, as the date on which the defendant's rental agreement would terminate unless she remedied her breach within three weeks.[9] On the stipulated date, May 12, 1983, the plaintiff informed the defendant of its intention to terminate her tenancy on June 12, 1983, because of her violation of article 11 (g). This third

henceforth constitute good cause for termination of your occupancy at the above premises:

"Violation of Lease Article 11G 'To have no animals or pets of any kind on the premises. . . .'

"Your failure to remedy the above situation shall henceforth constitute cause for termination of occupancy at the above premises.

"Dated at New London, Connecticut this 12th day of April, 1983.

"/s/ Arlene Davis"

[8] In a clerical error, the court mistakenly referred to this notice as having been sent a month later. The parties agreed at oral argument in this court that the notice was in fact dated and sent on April 12, 1983, and not on May 12, 1983.

[9] Exhibit C reads as follows:

"NOTICE PURSUANT TO CONNECTICUT GENERAL

STATUTES SEC. 47a-15

"To: Doris Greene
        87 F Michael Rd.
        New London, CT 06320

"You are hereby notified that the following conduct on your part constitutes a material non-compliance with an obligation primarily imposed upon tenants by law which materially affects the health and safety of the other tenants or materially affects the physical condition of the premises, is a violation of the rental agreement, or a violation of the adopted rules and regulations concerning your use and occupancy of the premises, to wit:

"Violation of Lease Article 11g 'To have no animals or pets of any kind on the premises. . . .'

"This rental agreement shall terminate May 12, 1983 unless such a breach can be and is remedied by repair or payment of damages on your part within twenty-one days from the date hereof.

"Dated at New London, Connecticut this 12th day of April, 1983.

"/s/ Arlene Davis"

notice expressly invited the defendant to voice, either by telephone or in writing, any objections she had to the commencement of eviction proceedings.[10] The court found that "[a]ll of these notices were served by mailing one copy of each and hand delivering another copy to the defendant. The defendant admitted that she had received these notices by mail and a copy hand delivered." The court noted, finally, that the defendant had offered no evidence that the plaintiff had failed to com-

---

[10] Exhibit D reads as follows:

"May 12, 1983

"Doris Greene
87F Michael Rd.
New London, CT 06320

"Dear Ms. Greene:

"This letter is to advise you that it is our intention to terminate your tenancy at the above premises on June 12, 1983.

"The reason for this termination is as follows:

"Violation of Lease Article 11g 'To have no animals or pets of any kind on the premises. . . .'

"If you do not voluntarily vacate the premises on or before the above termination date, it is our intention to commence eviction proceedings against you to recover possession of the premises. In the event that such an eviction proceeding is commenced you will receive notice and be given an opportunity to present a defense.

"If you have any objections which you desire to present to Management, you mail [sic] call Anthony Associates at 442-3094 in order to make an appointment for a meeting at which you may present these objections.

"If you have objections which you desire to present in writing you may state them in the space provided below and mail or deliver those objections to the following address:

"Anthony Associates Management
7A Michael Rd.
New London, CT 06320

"/s/ Arlene Davis
Arlene Davis
Authorized Agent

"I/We object to the commencement of eviction proceedings because:

"_____"

Date    Tenant's Signature

ply "with the provisions of the Code of Federal Regulations set forth in her special defenses." These various factual findings and conclusions of law are the crux of the present appeal.

The defendant's appeal contests the validity of her eviction in three respects. She claims that the trial court erred, with respect to the relevant notices: (1) in finding that they had been properly delivered; (2) in allowing them to be introduced into evidence at trial; and (3) in concluding that their terms complied with the applicable requirements of state and federal law. We find no error in any of these rulings.

I

The trial court's findings with respect to the delivery of the notices required by federal and state statute were twofold. Although there was little direct evidence of the manner in which the deliveries had been accomplished, the court heard testimony from the plaintiff's property manager about the customary manner in which the landlord handled the delivery of such notices. The customary pattern consisted of having notices served "by both hand delivery and mail delivery." In addition, the plaintiff's agent testified, without objection, that a notice to quit had been served on the defendant, and that this notice had been followed by the commencement of the summary process action against her. On the basis of this evidentiary record, the court determined that the termination notices had in fact been served "by mailing one copy of each and hand delivering another copy to the defendant." As previously noted, the court further found that the defendant had admitted, in her testimony at trial, "that she had received these notices by mail and a copy hand delivered."

The trial court's findings on delivery and receipt of the notices are findings of fact that must stand unless

they are "clearly erroneous in view of the evidence and pleadings in the whole record." Practice Book § 4061 (formerly § 3060D); *Tucker* v. *Alleyne,* 195 Conn. 399, 403, 488 A.2d 452 (1985); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). The defendant challenges only the court's interpretation of the relevant evidence, not its admissibility. In these circumstances, the question resolves itself into one of credibility that falls within the province of the trial court. *Robert Lawrence Associates, Inc.* v. *Del Vecchio,* 178 Conn. 1, 14, 420 A.2d 1142 (1979); *Hess* v. *Dumouchel Paper Co.,* 154 Conn. 343, 349, 225 A.2d 797 (1966). In weighing the testimony of the defendant concerning delivery of the termination notices to her, the court was entitled to find more persuasive her initial testimony acknowledging her receipt of each of the relevant notices than her subsequent statements casting doubt on which notices she had received. *Barrila* v. *Blake,* 190 Conn. 631, 639, 461 A.2d 1375 (1983); *Griffin* v. *Nationwide Moving & Storage Co.,* 187 Conn. 405, 422, 446 A.2d 799 (1982); *Raia* v. *Topehius,* 165 Conn. 231, 235, 332 A.2d 93 (1973). The defendant never denied having actual notice of the plaintiff's intention to terminate her lease because of her continued violation of its no pets clause. At trial, her testimony focused primarily on her alleged right to continue to have her dog because of security problems at the complex and because her written lease had not been formally renewed. On this record, we find no error in the trial court's findings on this issue.

## II

The trial court admitted the various termination notices denominated exhibits B, C and D into evidence over the objection of the defendant that they were inadmissible as business records because no foundation had been laid for their admission. The plaintiff offered these exhibits through the testimony of its property manager.

This witness testified that it was in the normal course of business for the plaintiff to prepare, serve and keep copies of termination notices, even though he himself had not participated in any of these functions. The court determined that this testimony sufficed to meet the business records requirements set forth in General Statutes § 52-180.[11]

---

[11] General Statutes § 52-180 provides: "ADMISSIBILITY OF BUSINESS ENTRIES AND PHOTOGRAPHIC COPIES. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility.

"(c) Except as provided in chapter 3, if any person in the regular course of business has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has caused any or all of them to be recorded, copied or reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless its preservation is otherwise required by statute. The reproduction, when satisfactorily identified, shall be as admissible in evidence as the original in any judicial or administrative proceeding, whether the original is in existence or not, and an enlargement or facsimile of the reproduction shall be likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement or facsimile shall not preclude admission of the original.

"(d) The term 'business' shall include business, profession, occupation and calling of every kind."

On appeal, the defendant claims, in her brief,[12] that the termination notices are not business records within § 52-180 because they were prepared, not in the ordinary course of business, but rather in anticipation of litigation. Relying on *Palmer* v. *Hoffman,* 318 U.S. 109, 111–15, 63 S. Ct. 477, 87 L. Ed. 645, reh. denied, 318 U.S. 800, 63 S. Ct. 757, 87 L. Ed. 1163 (1943), the defendant maintains that this purpose robs the notices of the indicia of trustworthiness that underlie the business record exception. We disagree with this argument for two reasons.

One reason is that this issue was not distinctly raised at trial. Although the defendant offered timely objections at trial to the admissibility of the notices, the basis for the objection was the alleged lack of competency of the witness to offer the notices into evidence. The defendant never objected to admission of the notices on the ground that they had been prepared for litigation. We need not review any claim of error that was not properly raised at trial. Practice Book §§ 288, 3063 (now § 4185); *State* v. *Barrett,* 197 Conn. 50, 53 n.2, 495 A.2d 1044 (1985), cert. granted, 476 U.S. 1114, 106 S. Ct. 1967, 90 L. Ed. 2d 652 (1986); *McKiernan* v. *Caldor, Inc.,* 183 Conn. 164, 166, 438 A.2d 865 (1981).

The other reason for upholding the ruling of the trial court is substantive. Even if we were to overlook the defendant's procedural failure, the defendant has read too much into *Palmer* v. *Hoffman,* supra. The generally accepted view of the test enunciated in that case is that documents prepared for litigation are excluded, not on a per se basis, but rather upon an inquiry into

---

[12] At oral argument, the defendant's counsel alluded to the issue that had been raised, in the trial court, about the competency of the plaintiff's witness to establish the proper foundation for admission of the termination notices as business records. Counsel did not, however, press this matter as an independent issue for review in this court. In the absence of proper briefing, we decline to address this matter further.

whether such documents bear circumstantial indicia of lack of trustworthiness. In the exercise of appropriate discretion, courts may exclude such records where they are self-serving and a motive for falsification can be demonstrated. *Lewis* v. *Baker,* 526 F.2d 470, 473 (2d Cir. 1975); *Caldecott* v. *Long Island Lighting Co.,* 417 F.2d 994, 996 (2d Cir. 1969); C. McCormick, Evidence (3d Ed. 1984) § 308; C. Tait & J. LaPlante, Handbook of Connecticut Evidence (1976) § 11.14. Although this court has recognized that the trustworthiness of business records, under § 52-180, "comes from their being used for business and not for litigation"; *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 388–89, 461 A.2d 422 (1983); we have not thereby mandated the exclusion of multipurpose documents that have ancillary utility in subsequent litigation. We have emphasized, instead: that § 52-180 should be liberally construed; id., 388; that the essential hallmark of admissibility under § 52-180 is the trustworthiness of the document; *American Oil Co.* v. *Valenti,* 179 Conn. 349, 358–59, 426 A.2d 305 (1979); *Hutchinson* v. *Plante,* 175 Conn. 1, 3–4, 392 A.2d 488 (1978); C. McCormick, supra, § 306; and that appellate review in these cases is limited to ascertaining whether the trial court abused its discretion. *American Oil Co.* v. *Valenti,* supra, 360; *Doran* v. *Wolk,* 170 Conn. 226, 232, 365 A.2d 1190 (1976).

Examining the evidence in this case in the light of these governing principles, we reiterate that the plaintiff's property manager testified that the notices in question had been prepared in the ordinary course of the managerial responsibilities of a landlord. He testified, without contradiction, that, although it was the plaintiff's policy to initiate eviction procedures upon discovery of a violation of the no pets clause, such procedures would immediately be stopped if the tenant removed the animal from the premises. This testi-

mony supports the plaintiff's assertion of the duality of purposes served by the termination notices. Furthermore, the defendant has not alleged that the copies of the notices that were admitted at trial had been altered or otherwise falsified in any way. Under these circumstances, any remaining concerns about the probity of the documents in the present litigation relate only to the weight the notices should be given and do not preclude their admissibility. The trial court therefore did not abuse its discretion in admitting the notices into evidence. See *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.*, supra, 387.

## III

We consider finally whether the three notices sent by the plaintiff suffice to meet the statutory requirements of § 47a-15 and the regulatory requirements of section 236 and section 8 housing contained in 24 C.F.R. §§ 450.4 (a), 886.101 and 886.128. The defendant has alleged that the notices are defective in the following respects: (1) the notice issued on April 12, 1983, pursuant to § 47a-15, which advised the tenant of a May 12 termination date, fails to comply with the thirty day limitation of § 47a-15, since the notice would have taken at least one day to be delivered; (2) the notice to quit contained in the plaintiff's letter of May 12, 1983, does not advise a tenant that if a judicial proceeding for eviction should be instituted the tenant could present a defense, and thus the notice fails to comply with 24 C.F.R. § 450.4 (a); and (3) that same letter does not advise a tenant that he or she has ten days to present objections to eviction to management, and thus the notice fails to comply with 24 C.F.R. § 886.128 (a).

Before we address each of these alleged defects, we need to identify the standards by which to test the adequacy of the termination notices sent to the defend-

ant. "[T]he remedy of summary process is available only when there is a lease and it has been terminated. The purpose of the action is to enable the landlord upon such termination to recover possession from the tenant. . . . Because of the summary nature of this remedy, the statute granting it has been narrowly construed and strictly followed." *Jo-Mark Sand & Gravel Co.* v. *Pantanella,* 139 Conn. 598, 600–601, 96 A.2d 217 (1953); see also *Marrinan* v. *Hamer,* 5 Conn. App. 101, 103, 497 A.2d 67 (1985). It follows that, before a landlord may pursue its statutory remedy of summary process under § 47a-23, the landlord must prove its compliance with all the applicable preconditions set by state and federal law for the termination of a lease. The plaintiff's complaint in this case duly alleged that the notices it had sent to the defendant met the substantive requirements prescribed by these regulatory provisions. The trial court therefore erred in criticizing the defendant for her failure to offer evidence to show the plaintiff's noncompliance with the applicable requirements. Because the defendant's affirmative defenses raising these issues were precisely the same issues as the plaintiff had pleaded, they did not relieve the plaintiff of its burden of proving the propriety of its termination of the lease as a condition to its right to summary process. See *Southland Corporation* v. *Vernon,* 1 Conn. App. 439, 443, 473 A.2d 318 (1984).

In order to demonstrate its compliance with the notices required for a proper termination, a landlord must show that the notices given to the tenant apprised her of the information a tenant needs to protect herself against premature, discriminatory or arbitrary eviction. *Joy* v. *Daniels,* 479 F.2d 1236, 1241 (4th Cir. 1973); *Anderson* v. *Denny,* 365 F. Sup. 1254, 1260 (W.D. Va. 1973); *Apartments, Inc.* v. *Williams,* 43 N.C. App. 648, 651, 260 S.E.2d 146 (1979). To further this salutary purpose, the notice requirements of § 47a-15

must be construed strictly. *Jo-Mark Sand & Gravel Co.* v. *Pantanella,* supra. Strict construction does not, however, require ritualistic compliance with statutory or regulatory mandates.

It is appropriate to enforce the mandates of our own statutes in this area in a purposive manner consistent with the pattern that has developed for the enforcement of the federal rights of tenants in federally subsidized housing. For such tenants, despite a recognition that a loss of federally subsidized housing implicates due process rights under the fifth amendment to the United States constitution, federal law has moved away from requiring either a special federal forum or special federal forms. Federal courts have concluded that a tenant's right to fair adjudication of good cause for the termination of his tenancy can be vindicated by recourse to the normal judicial process of state court eviction procedures. *Perry* v. *Royal Arms Apartments,* 729 F.2d 1081, 1082 (6th Cir. 1984); *Swann* v. *Gastonia Housing Authority,* 675 F.2d 1342, 1347 (4th Cir. 1982); *Jeffries* v. *Georgia Residential Finance Authority,* 503 F. Sup. 610, 621 (N.D. Ga. 1980), aff'd, 678 F.2d 919 (11th Cir. 1982). In 1981, the Congress amended the statute governing section 8 eviction procedures to eliminate a former requirement that termination notices could only be given by public housing authorities. 42 U.S.C. § 1437f (d) (1) (B). Federal regulations require proper notification before such a tenancy can be terminated, but, for leases entered into after October 1, 1981, they no longer regulate the content of the notice of termination, but rely instead on the notice procedures prescribed by state or local law. 24 C.F.R. § 882.215 (c) (3). These less stringent regulations now govern the eviction of tenants who receive rent subsidies under section 8 programs even though they reside in housing complexes originally financed by federal sec-

tion 236 subsidies. 24 C.F.R. § 882.215 (f).[13] See generally National Housing Law Project, HUD Housing Programs (1985 Sup.) c. 14. These federal developments indicate a movement away from formalism.

We therefore conclude that judicial appraisal of a landlord's compliance with both state and federal requirements for notices of termination must reflect the purpose that the notices were meant to serve. As we have held in other contexts, in which regulatory and constitutional rights were also implicated; *State* v. *Godek,* 182 Conn. 353, 359–60, 438 A.2d 114 (1980), cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981); not every deviation from the strict requirements of either statutes or regulations warrants dismissal of an action for summary process. When good cause for termination of a lease has clearly been shown, and when notices of termination have been sent in strict compliance with statutory timetables, a landlord should not be precluded from pursuing summary eviction proceedings because of hypertechnical dissection of the wording of the notices that he has sent. See *Brezina* v. *Dowdall,* 472 F. Sup. 82, 85 (N.D. Ill. 1979); *Southland Corporation* v. *Vernon,* supra, 452–53; *Smith* v. *Hendrix,* 162 Ga. App. 299, 301–303, 290 S.E.2d 504 (1982).

Proceeding from these principles, we conclude that the plaintiff in this case sufficiently established the preconditions for its action for summary process. The most important of these conditions is that the plaintiff prove good cause for termination of a lease. In this

---

[13] In regulatory changes announced in 1984, HUD made the protections of 24 C.F.R. § 247, governing federally subsidized housing, inapplicable to the eviction of tenants who participate in the Section 8 Existing Housing Program. 24 C.F.R. § 882.215 (f) (1984). The effect of this change was to eliminate explicit provisions regulating the content of the notice of termination. This change cannot, of course, supersede the specific incorporation of the § 247 requirements in the lease presently before us.

case, good cause was shown because of the defendant's material and continued noncompliance with the no pets clause in her lease. Good cause is not an issue in this appeal.

There is an issue about whether the plaintiff complied with the time requirements of § 47a-15. That statute conditions a landlord's right to evict on the delivery of a written notice to the tenant specifying the tenant's wrongful acts or omissions and specifies that the notice should warn the tenant that "the rental agreement shall terminate upon a date not less than thirty days after receipt of the notice." The purpose of this thirty day provision is to provide a grace period in which a tenant may correct the wrongful conduct that prompted the initiation of termination proceedings. *Kapa Associates* v. *Flores,* 35 Conn. Sup. 274, 278, 408 A.2d 22 (1979).

In this case, the plaintiff, on April 12, 1983, mailed and served a § 47a-15 notice that set a termination date of May 12, 1983. The defendant argues that this notice was untimely because there was no evidence about when it was in fact delivered to the defendant. We read the record differently. The plaintiff offered testimony at trial that the notice had been mailed on the date of its issuance and the trial court found that a duplicate had been personally served on the defendant on that same day. Although our statutes contain no special definition for "receipt of the notice" under § 47a-15, comparable federal regulations concerning the sending of termination notices to a tenant provide that "[t]he date on which a notice shall be deemed to be received by the tenant" shall be the later of two dates: the mailing of a notice of termination or the service of such a notice on the tenant. 24 C.F.R. § 450.4 (b). When there has been actual timely service upon a tenant, nothing in our statute or these regulations postpones "receipt of

the notice" until *delivery* of a mailed notice of impending termination. The plaintiff has fully complied with the time requirements of § 47a-15.

There is also an issue about whether the contents of the plaintiff's termination notices complied with applicable federal regulations. Because the plaintiff's housing complex was financed in part through federal § 236 subsidies, the defendant's lease, in article 4b, incorporated the provisions of 24 C.F.R. § 450. The plaintiff was therefore obligated to provide the defendant with a termination notice that complied with 24 C.F.R. § 450.4 (a). That regulation requires proper service of a written notice informing the tenant of: (1) the date "the tenancy is terminated"; (2) the reasons for the landlord's action; and (3) the tenant's right to present a defense if a judicial proceeding for eviction is instituted. The plaintiff's notice of May 12, 1983, was designed to comply with these requirements.

The defendant maintains that this notice is deficient in three respects. She claims that the letter does not sufficiently state the date her "tenancy is terminated" because it merely advises her of the plaintiff's "intention" to terminate her tenancy on June 12, 1983. We disagree. In light of the earlier warning contained in the letter of April 12, indicating an intent to proceed with termination of the lease on May 12, the defendant cannot have been misled about the significance of the June 12 termination date. The defendant's complaint about failure to advise her about her right to present a defense in judicial eviction proceedings is even less persuasive. Since the plaintiff's letter clearly informed the defendant that, "[i]n the event [of an] eviction proceeding . . . you will receive notice and be given an opportunity to present a defense," the gravamen of this argument must be that the relevant "eviction proceeding" is not explicitly denominated a "judicial proceeding for eviction." Again, we fail to perceive how

this minor deviation from the language of the federal regulation can have prejudiced the defendant's rights in any way. The defendant's final issue pursuant to this regulation contests the trial court's finding with respect to the manner of delivery of this notice to the defendant, an issue that we have resolved adversely to the defendant in part I of this opinion.

Because the defendant herself was receiving federal section 8 rent subsidies, the plaintiff's termination notices also had to comply with the requirements of 24 C.F.R. § 886.128 (a). That regulation states that the landlord must give a tenant "a written notice of the proposed eviction, stating the grounds and advising the Family that it has ten days (or such greater number, if any, that may be required by law) within which to respond" to the landlord. The defendant contends that none of the notices she received apprised her of this ten day period.

The plaintiff argues that the letter sent on May 12 complies with the substance if not with the letter of the ten day requirement. Although that letter did not expressly inform the defendant that she had ten days to respond to the landlord, it did advise her that she could call or write management in order to present any objection to the termination of her lease. More important, according to the plaintiff, in postponing the date of termination to a date thirty days in the future, the notice in effect offered the defendant a more generous time period for response than that mandated by the federal regulation. The persuasiveness of this argument depends upon the factual circumstances in which it arises. We can conceive of cases in which an open-ended invitation to respond might lull a tenant into inaction and thus might excuse a failure to undertake timely remedial measures to correct noncompliance with a lease. This is not such a case. The record before us

reflects the actions of a tenant who, fully cognizant of the landlord's insistence on enforcing the no pets clause in her lease, steadfastly persisted, until and including the date of trial, in asserting that she had a right to keep a doberman pinscher in her apartment. In these circumstances, the content of the notice sent by the plaintiff sufficiently complied with the requirements of 24 C.F.R. § 886.128 (a).

In addition to these arguments concerning the validity of the termination notices sent to the defendant, the defendant has raised a final claim that the plaintiff is not entitled to summary process because of the plaintiff's alleged failure to prove service of a notice to quit on the defendant. The defendant's brief makes this contention without specifically identifying whether it is meant as an attack on the formal notice to quit possession which, according to the plaintiff, was served on the defendant as a precedent to the initiation of the summary process action, or as yet another criticism of the notice of termination contained in the letter of May 12, 1983. The latter criticism we have fully addressed earlier in this opinion. As to the former, the court file, of which we may take judicial notice, contains a document expressly denominated a notice to quit, dated June 13, 1983, that on its face manifests its service by a duly authorized process server. Apart from her general denial of the allegations of the plaintiff's complaint, the defendant has pointed to nothing in the trial record to show that the validity of this notice, or its service, was ever made a specific issue before the trial court. The trial court found all the issues for the plaintiff. In the absence of a request by the defendant for a further articulation, pursuant to Practice Book § 3082 (now § 4051), of the basis on which the trial court came to this conclusion with respect to the notice to quit, we lack the record we need for review of this issue. Without such a record, which it was the

defendant's burden to produce, we decline to find error in the ruling of the trial court on this issue. *Steve Viglione Sheet Metal Co.* v. *Sakonchick,* 190 Conn. 707, 714, 462 A.2d 1037 (1983); see *Barnes* v. *Barnes,* 190 Conn. 491, 493, 460 A.2d 1302 (1983); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 221.

There is no error.

In this opinion the other justices concurred.