STATE OF CONNECTICUT *v.* KENNETH DAMON
(13672)

PETERS, C. J., SHEA, COVELLO, HULL and SANTANIELLO, Js.

Argued December 13, 1989—decision released March 6, 1990

*Mark Rademacher,* for the appellant (defendant).

*Geoffrey E. Marion,* deputy assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, for the appellee (state).

COVELLO, J. The defendant, Kenneth Damon, appeals from his conviction of murder in violation of General

Statutes § 53a-54a (a).[1] The dispositive issues are: (1) whether the trial court erred in denying the defendant's motion to suppress inculpatory statements made by the defendant to the police; and (2) whether the trial court violated the defendant's constitutional rights of confrontation, compulsory process and due process when it admitted an autopsy report into evidence, under the business record exception to the hearsay rule. We find no error.

The jury could reasonably have found the following facts: On September 9, 1987, Monica Joyner was found stabbed to death in the basement of a three family dwelling in New Haven. The victim lived on the second floor with her husband and two young children. The first floor apartment was occupied by Prisilla Damon, the defendant's mother. Prisilla Damon lived alone, but the defendant occasionally stayed overnight at her apartment. The defendant worked the noon to eight p.m. shift at Bozzuto's Trucking Company in Cheshire. On the night of September 8, 1987, Prisilla Damon picked up the defendant at Bozzuto's, and at midnight they returned to her apartment, where the defendant planned to spend the night.

At approximately 11:15 a.m. on September 9, Mitchell Stevenson, the owner of the building, left his third

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

floor apartment and walked down into the basement, and there discovered the victim lying face down in a pool of blood on the basement floor. The victim's clothing was in partial disarray. The victim had suffered multiple stab wounds to her upper body, head and face.

On the afternoon of September 9, Prisilla Damon went to the New Haven police station and gave a statement indicating that the defendant had been at her apartment that morning. Two plainclothes detectives, Francisco Ortiz and Leroy Dease, drove to Bozzuto's, where the defendant was working. The detectives asked the defendant if he would voluntarily accompany them to the New Haven police station to be interviewed in connection with a homicide they were investigating. The detectives informed the defendant that he was not under arrest, that he did not have to accompany them, and that he was free to leave if he chose to. The defendant agreed to accompany the detectives.

The defendant was taken to the detective division and given *Miranda*[2] warnings. The defendant was not handcuffed, was not told that he was under arrest, and was not told that he was a suspect. The defendant never requested that he be allowed to go home.

Between 9 and 9:30 p.m. the detectives began questioning the defendant in a conference room.[3] The defendant initially denied any knowledge of the victim

---

[2] *Miranda* v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] The record reveals that the defendant was taken to the police station in an unmarked car driven at normal speeds, without the emergency lights or siren. The car entered the police station via an underground parking garage, which was the normal entrance into the building for detectives. The defendant was taken by public elevator to the detective division on the third floor, and then to the conference room. The conference room contained windows, and during the course of the defendant's interview the detectives were in and out of the room. The door of the conference room remained open during the course of the interview.

or her death. After several hours of questioning, however, at approximately 12:15 a.m. on September 10, the defendant gave a tape recorded confession in which he admitted killing the victim.[4] The defendant claimed that he had acted in self-defense. He stated that the victim, while "high" on drugs, had knocked on the back door of his mother's apartment at approximately 9:30 a.m. and had asked him for some cocaine. He further stated that the victim took a knife from his mother's kitchen, then lured him down to the basement, where she attacked him with the knife. The defendant stated that during the ensuing struggle he accidentally stabbed the victim. The defendant told the police that he had wrapped the knife in a brown paper bag and had thrown it into a garbage can in front of the Dixwell Plaza shopping area.[5]

The defendant was thereafter charged in a substitute information with murder, in violation of General Statutes § 53a-54a (a). On May 24, 1988, the defendant filed a motion to suppress the statements he had made to the police. In his motion to suppress, the defendant claimed that his statements were made without a voluntary, knowing and intelligent waiver of his constitutional privilege against self-incrimination, and that the statements were made involuntarily in violation of his constitutional rights to due process.

---

[4] At approximately 9:30 p.m., Detective Ortiz left the conference room, leaving the defendant and Detective Dease alone. Approximately thirty minutes later Detective Anthony DiLullo entered the conference room. Shortly after DiLullo's entrance, the defendant started shaking and crying. The defendant then admitted to the police that he had stabbed the victim. The defendant then agreed to make a taped statement of his version of the stabbing.

[5] Approximately three days later, Nathan Collins, a maintenance worker, found a butcher knife wrapped in a brown paper bag while he was mowing the lawn at the Dixwell Plaza. Collins threw the knife into a dumpster and the police were unable to recover it. When the police visited Prisilla Damon on September 10 and inquired if she was missing any knives, she noticed that a butcher knife she usually kept near her sink was missing.

On November 29, 1988, the day before the trial began, the trial court conducted a suppression hearing and thereafter denied the motion to suppress. The trial court concluded that while there was no probable cause to arrest the defendant up until the time he made the inculpatory statements, the defendant had voluntarily accompanied the police to New Haven, had voluntarily remained at the police station, and was not in police custody at the time he made his incriminating statements. The trial court further found that the defendant's statements were made with full knowledge of his *Miranda* rights.

On December 1, 1988, at the start of the trial, the state represented to the court that Malka B. Shah, the pathologist who performed the autopsy on the victim, was in India and was not expected back "for some period of time." The state explained that it intended to call another pathologist from the same office, Ira Kanfer, who could properly interpret and explain the findings contained in the report.

The defendant objected to the admission of the autopsy report through Kanfer and requested three alternative rulings from the trial court. First, he requested that the court preclude Kanfer from testifying. Second, the defendant requested that the court grant a continuance until Shah returned from India. Third, the defendant requested that the court, if it denied the first two requests, grant a continuance so that he could retain his own pathologist to examine the autopsy report. Upon inquiry, the trial court established that Shah had taken a three month vacation and would not be back for two weeks. The trial court overruled the defendant's objections and denied the requests for a continuance. The trial court ruled that the autopsy report would be admissible as a business record, regardless of Shah's availability, if a proper foundation were laid and Kanfer could explain the report.

Upon inquiry by the trial court, defense counsel stated that he had obtained a copy of the autopsy report "two months or so before this case started." The trial court concluded that there had been ample opportunity to review the report and to retain a pathologist to explain it from the defendant's standpoint.

Kanfer then testified for the state. Kanfer limited his testimony to explaining the terms used in the autopsy report and describing the victim's wounds as noted therein. He testified that the autopsy report was a standard report made by the person who performed the autopsy, that it was a report made in the regular course of business at the medical examiner's office, that it was the regular course of business after making the report to keep it on file at the medical examiner's office, and that the report was made soon after the autopsy was completed.

The state offered the autopsy report as a full exhibit and the defendant objected. The trial court concluded that a sufficient foundation had been laid and admitted the autopsy report. Kanfer then testified briefly concerning the four fatal stab wounds and the cause of death, reiterating the opinions of Shah as contained within the report.

On December 7, 1988, the jury found the defendant guilty as charged. The defendant immediately filed a motion for judgment of acquittal and a motion for a new trial. The trial court denied both motions. On February 24, 1989, the defendant was sentenced to a prison term of sixty years. The defendant thereafter filed a direct appeal from that judgment with this court, pursuant to General Statutes § 51-199 (b) (3).[6]

---

[6] General Statutes § 51-199 provides in pertinent part: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

## I

The defendant's first claim is that the trial court erred in denying the defendant's motion to suppress his inculpatory statements on the ground that he was arrested without probable cause and that therefore, the statements must be suppressed as the fruit of an illegal arrest. The gravamen of the defendant's claim is that he was in the custody and complete control of the police prior to and during the interview, and he was therefore "seized" and under arrest for constitutional purposes. The defendant alleges that because no probable cause existed at that time for his arrest, his confession should have been suppressed. We do not agree.

It is well settled that the fourth amendment[7] requires that a confession which is the product of an arrest or a detention made without probable cause must be excluded from evidence. *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); see also *Brown* v. *Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). We previously have held that the trial court must make two determinations in assessing the admissibility of a confession made during custodial interrogation following a claimed warrantless arrest: (1) whether or not the defendant has been seized; and (2) whether or not there was probable cause for the seizure. *State* v. *Acquin,* 187 Conn. 647, 651, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983); *State* v. *Ostroski,* 186 Conn. 287, 290, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982).

---

[7] The fourth amendment to the United Stated Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Because the trial court expressly found that there was no probable cause for the defendant's arrest prior to his making inculpatory statements, only the first question is at issue in this appeal.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *State* v. *Acquin,* supra, 655. We have held that " '[t]o constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained.' " *State* v. *Derrico,* 181 Conn. 151, 159, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980), quoting *Jenkins* v. *United States,* 161 F.2d 99, 101 (10th Cir. 1947); see also *State* v. *Magnotti,* 198 Conn. 209, 212–13, 502 A.2d 404 (1985).

Voluntary interactions between the police and citizens do not implicate fourth amendment protections. *United States* v. *Webster,* 750 F.2d 307, 320 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 105 S. Ct. 2340, 85 L. Ed. 2d 855 (1985). A person is not arrested or seized under the fourth amendment if he freely chooses to enter into or continue an encounter with the police. *United States* v. *Brunson,* 549 F.2d 348, 357 (5th Cir. 1977), cert. denied, 434 U.S. 842, 98 S. Ct. 140, 54 L. Ed. 2d 107 (1977). Police officers do not violate an individual's constitutional rights by approaching him, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. *Florida* v.

*Royer,* 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State* v. *Brown,* 199 Conn. 47, 52–53, 505 A.2d 1225 (1986).

A finding of fact will not be overturned on appeal unless it is clearly erroneous. *State* v. *Pittman,* 209 Conn. 596, 606, 553 A.2d 155 (1989); *State* v. *Young,* 191 Conn. 636, 652, 469 A.2d 1189 (1983); see Practice Book § 4061. Where a constitutional issue turns upon a factual finding, however, this court has applied a stricter standard of review of the factual finding. "The issue is factual, but our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. *Columbe* v. *Connecticut,* 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961)." *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982).

We conclude, after a scrupulous examination of the record, that the evidence presented during the suppression hearing was sufficient to support the trial court's conclusion that the defendant was neither under arrest nor seized for constitutional purposes until after he voluntarily gave the inculpatory statements to the police. As factfinder, the trial court was entitled to accept the uncontroverted testimony of the three detectives who traveled to Bozzuto's that the defendant was not a suspect at that time,[8] that his decision to accompany the police was completely voluntary, that he expressed no reservations about going to the police sta-

---

[8] Testimony elicited at the suppression hearing and at trial indicates that the police originally suspected the landlord, Mitchell Stevenson, of the murder. Stevenson was questioned a number of times on the day of the crime, including twice at the police station, and was told that he was a suspect. He was fingerprinted, strip searched, and his apartment was searched.

tion or answering questions about the homicide, that he was informed that he was not under arrest and could leave if and when he chose to, that before leaving Bozzuto's he returned to his work area unescorted in order to retrieve his backpack, which the police did not search, that he traveled to New Haven in an unmarked car that did not contain a restraining cage and which could be unlocked from the inside, that he was not physically or verbally restrained or handcuffed, and that he never requested to go home. See, e.g., *United States* v. *Mendenhall,* supra.

Although the defendant was in the company of one or two detectives until midnight, when his confession was recorded, the testimony indicates that the actual interview did not begin until sometime between 9 and 9:30 p.m. and that the defendant first implicated himself shortly after 10 p.m.[9] Also, the issuance of *Miranda* warnings as a cautionary measure does not mean that the defendant had been arrested. See, e.g., *Government of Virgin Islands* v. *Commissiong,* 698 F. Sup. 604, 612 (D. Virgin Islands 1988).

The trial court could reasonably have concluded that the defendant's contact with the police was voluntary and did not amount to a seizure or arrest prior to the time he made the inculpatory statements. This conclusion is in accord with recent decisions of this court containing similar factual backgrounds. See *State* v. *Young,* supra; *State* v. *Acquin,* supra; *State* v. *Derrico,* supra.

## II

The defendant next argues that his constitutional rights to confrontation, compulsory process and due process were violated when the trial court admitted the victim's autopsy report into evidence, as a business record, through the testimony of a pathologist who was

---

[9] See footnote 4, supra.

not present at the autopsy, after the trial court had denied the defendant's request for a continuance. We do not agree.

To gain admission of a document under the business record exception to the hearsay rule,[10] the proponent

[10] "[General Statutes] Sec. 52-180. ADMISSIBILITY OF BUSINESS ENTRIES AND PHOTOGRAPHIC COPIES. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility.

"(c) Except as provided in chapter 3, if any person in the regular course of business has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has caused any or all of them to be recorded, copied or reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless its preservation is otherwise required by statute. The reproduction, when satisfactorily identified, shall be as admissible in evidence as the original in any judicial or administrative proceeding, whether the original is in existence or not, and an enlargement or facsimile of the reproduction shall be likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement or facsimile shall not preclude admission of the original.

"(d) The term 'business' shall include business, profession, occupation and calling of every kind."

Autopsy reports are also admissible pursuant to General Statutes § 19a-412, which provides: "(Formerly Sec. 19-536). RECORDS AS EVIDENCE. The records of the office of the chief medical examiner, or transcripts thereof certified by the chief medical examiner or his authorized representative, shall be subject to subpoena and shall be admissible in evidence in any court

must show that (1) the document was made in the regular course of business, (2) it was the regular course of business to make such a record, and (3) the record was made when the act, transaction or event occurred, or shortly thereafter. *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 383–84, 461 A.2d 422 (1983). To qualify a record as a business entry, a witness must testify to the three requirements, but the witness need not have been the entrant himself or even in the employ of the business when the entry was made. See, e.g., *Baumert-Moran Sales Co.* v. *Red Bird Truck Rental Corporation,* 149 Conn. 42, 45, 175 A.2d 189 (1961); *D'Amato* v. *Johnston,* 140 Conn. 54, 62, 97 A.2d 893 (1953).

"[T]he essential hallmark of admissibility under § 52-180 is the trustworthiness of the document . . . ." *Jefferson Garden Associates* v. *Greene,* 202 Conn. 128, 141, 520 A.2d 173 (1987). Kanfer testified that the autopsy report was a standard report, made in the regular course of business soon after the autopsy was completed, and that it was the regular course of business to keep the report on file at the medical examiner's office. In light of Kanfer's testimony and the nature of the document itself, which is a report derived from established routine procedures designed to record objective facts and observations, we conclude that the trial court did not abuse its discretion in admitting the autopsy report as a business record.

The defendant further argues, however, that even if the admission of the autopsy report complied with

---

in the state in the same manner and subject to the same conditions as hospital records as provided in section 4-104, except that the findings or conclusions of the chief medical examiner, his deputy, an associate medical examiner or an assistant medical examiner as to the cause or circumstances of death, other than those set forth in the death certificate or the autopsy report, and statements by witnesses or other persons and conclusions upon extraneous matters shall not be admissible."

the statute, its admission through the testimony of Kanfer violated his constitutionally protected confrontation rights.[11] Although the confrontation clause and the hearsay rule protect similar values, the two are not coextensive. It is well established, however, that hearsay evidence may be admitted without violating the confrontation clause where the evidence falls within a firmly rooted hearsay exception. See, e.g., *Ohio* v. *Roberts,* 448 U.S. 56, 63–66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); *State* v. *Cosgrove,* 181 Conn. 562, 571–72, 436 A.2d 33 (1980). "Firmly rooted exceptions to the hearsay rule do not violate the confrontation clause." *United States* v. *Baker,* 855 F.2d 1353, 1360 (8th Cir. 1988), cert. denied, U.S. , 109 S. Ct. 2072, 104 L. Ed. 2d 636 (1989). The precepts of confrontation are satisfied when an out-of-court statement complies with the conditions of a well established exception to the hearsay rule. *Bourjaily* v. *United States,* 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

Other courts have specifically rejected confrontation claims involving autopsy reports in factual backgrounds similar to that presented in this appeal. See, e.g., *Montgomery* v. *Fogg,* 479 F. Sup. 363, 369–71 (S.D.N.Y. 1979); *Collins* v. *State,* 267 Ind. 233, 235–36, 369 N.E.2d 422 (1977). Also, in *State* v. *Cosgrove,* supra, we rejected similar claims in an analogous context. In *Cosgrove,* a toxicological report on seized marijuana was admitted as a business record. The defendant in that case argued that admission of the report violated his right of con-

---

[11] The sixth amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

frontation because the report contained the statements of a chemist who was not called to testify. In reaching our conclusion that no violation of the defendant's confrontation right had occurred, we focused on whether such reports were sufficiently trustworthy and reliable to be placed before the jury without confrontation of the declarant. Id., 569–78; see also *Reardon* v. *Manson,* 806 F.2d 39 (2d Cir. 1986), cert. denied, 481 U.S. 1020, 107 S. Ct. 1903, 95 L. Ed. 2d 509 (1987); *State* v. *King,* 187 Conn. 292, 309–15, 445 A.2d 901 (1982).

The same factors that supported the reliability of the toxicological report admitted in *Cosgrove* are largely present in this case.[12] An autopsy report derives from well recognized, routine procedures, and records objective facts. These procedures are performed hundreds of times each year, and in light of their frequency, are so generally considered reliable that they are normally undisputed. The pathologist performing the autopsy, Shah, had no motive to falsify her findings and owed no special allegiance to the state's attorney. Shah, as a physician and a state employee, has a professional duty to report the results of her work in an accurate

---

[12] The factors that we identified as determinative in the question of whether a toxicological report is sufficiently reliable and trustworthy to be admitted without confrontation of the declarant included: (1) a toxicological report is the record of the results of well recognized chemical and laboratory procedures; (2) it contains a record of objective facts and not only opinion; (3) the report is the record of routine tests performed hundreds or thousands of times a year, and in light of their frequency are so generally considered reliable that they are normally undisputed; (4) the chemist reporting the facts would have no motive to falsify the records but would be under a strict duty as an employee and a scientist to make an accurate report to preserve her job and the integrity of the toxicological laboratory; (5) the chemist owes no allegiance per se to the state's attorney; and (6) while such tests are not purely mechanical, they fall well within the category of those types of tests whose reliability has been consistently demonstrated and generally accepted, and do not contain the degree of subjectivity that would warrant production of the declarant. *State* v. *Cosgrove,* 181 Conn. 562, 575–77, 436 A.2d 33 (1980).

and truthful manner. See *State* v. *Cosgrove,* supra, 575–77. Like a toxicology report, an autopsy report is essentially a factual report limited to objective, physical observations. As such, it contains sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. See *Montgomery* v. *Fogg,* supra, 370.

The state was not obligated to demonstrate the unavailability of Shah. Section 52-180 expressly provides that the proponent of the business record need not produce that person who made the record or show that the person is unavailable. *State* v. *Jeustiniano,* 172 Conn. 275, 280, 374 A.2d 209 (1977). Unavailability need not always be demonstrated to satisfy the confrontation clause. *State* v. *Vessichio,* 197 Conn. 644, 657–60, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

### III

The defendant's final contention is that the trial court's denial of his request for a continuance, until Shah returned from India or until the defendant could retain his own pathologist to examine the report, violated his rights to compulsory process or due process. The decision to grant a request for a continuance lies within the sound discretion of the trial court and will not be disturbed on appeal absent clear abuse of that discretion. *State* v. *Aillon,* 202 Conn. 385, 394, 521 A.2d 555 (1987); *State* v. *Stanley,* 197 Conn. 309, 311–12, 497 A.2d 46 (1985). The defendant bears the heavy burden of proving that the trial court acted arbitrarily and substantially impaired the defendant's ability to defend himself. *State* v. *Beckenbach,* 198 Conn. 43, 47–48, 501 A.2d 752 (1985).

The defendant here fails to carry this burden. There is nothing in the record to indicate that Shah would have given any testimony favorable to the defendant. See *State* v. *Aillon,* supra, 396. Kanfer, a qualified

pathologist who had performed over 800 autopsies, was present in court to explain fully the meaning of the autopsy report and was subject to cross-examination by the defendant. Also, the defendant had possession of a copy of the autopsy report for more than two months and had ample opportunity to review its content and retain an expert witness to explain its content, if he so desired. Furthermore, the defendant requested the continuance one day after the start of trial. The trial court has a responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice. See *State v. Bethea*, 167 Conn. 80, 83, 355 A.2d 6 (1974). Based upon the record it cannot be said that the trial court abused its discretion or deprived the defendant of his constitutional rights to compulsory process or due process of law.

There is no error.

In this opinion the other justices concurred.