Nicholas P. MANOCCHIO,
Petitioner, Appellee,

v.

John MORAN, Director, Department of
Corrections, Respondent, Appellant.

No. 89–1310.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1989.

Decided Sept. 24, 1990.

Rehearing and Rehearing En Banc
Denied Nov. 14, 1990.

Annie Goldberg, Sp. Asst. Atty. Gen., with whom James E. O'Neil, Atty. Gen., Providence, R.I., was on brief for respondent, appellant.

John A. Macfadyen, Providence, R.I., for petitioner, appellee.

Before LEVIN H. CAMPBELL, Chief Judge, BROWN,* Senior Circuit Judge, and BREYER, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal presents the question of whether, in a state criminal trial in which the accused is charged with murder and its lesser included offenses, the introduction into evidence of an autopsy report for the purpose of proving the cause of death, without the personal presence of the medical examiner who prepared and executed the report, violates the Confrontation Clause of the federal Constitution. Contrary to the district court, we hold that use of this report did not violate the Constitution.

The State of Rhode Island appeals from the judgment of the United States District Court for the District of Rhode Island granting the petition of Nicholas P. Manocchio for habeas corpus and overturning his state manslaughter conviction in the 1980 death of Richard Fournier. *Manocchio v. Moran*, 708 F.Supp. 473 (D.R.I.1989). The district court ruled that the admission into evidence of an autopsy report in the absence of the medical examiner who performed the autopsy, Dr. Joel Zirkin, "in person or by deposition," *id.* at 479, deprived defendant of his Sixth Amendment right of confrontation and denied him "a full and fair trial on a crucial matter in the case." *Id.* Finding error "of constitutional dimension" that it could not regard as harmless, the court directed issuance of the writ under 28 U.S.C. § 2254(d)(2),[1] unless the State of Rhode Island afforded defendant a new trial within 120 days. The

---

\* Of the Fifth Circuit, sitting by designation.

1. In granting the writ, the district court gave as its reason for failing to presume the correctness of determinations on factual issues made by the State court "that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing." 28 U.S.C. § 2254(d)(2).

district court granted the State's motion for a stay of judgment pending this appeal.

FACTS

The facts are fully set out in the opinion of the district court, *Manocchio v. Moran*, 708 F.Supp. 473 (D.R.I.1989), and the Rhode Island Supreme Court, *State v. Manocchio*, 497 A.2d 1 (R.I.1985). We repeat only those portions necessary to understand the reasoning of this opinion.

The challenged autopsy report was admitted into evidence over the objections of the petitioner that it violated his rights under the Confrontation Clause. The prosecution offered the report to establish that decedent's death was caused by multiple injuries, injuries otherwise shown to have been sustained during a beating at a parking lot. The autopsy was performed by Dr. Joel N. Zirkin, a forensic pathologist who was an Associate Chief Medical Examiner in the Office of the Medical Examiner for the State of Rhode Island, who had by the time of the trial separated himself from the office and removed permanently to Israel. Dr. Zirkin prepared and signed the autopsy report which was co-signed by two associates—Dr. Arthur C. Burns, Deputy Chief Medical Examiner, and William Q. Sturner, Chief Medical Examiner. The report incorporated information derived from various analyses performed by outside laboratories as well as an examination of the decedent's formalin-fixed brain performed by another specialist, Dr. Mary Ambler. Dr. Ambler reported upon the results of the formalin-fixed brain examination at a conference attended by all three signatories to the report. The report also stated that the North Providence Police Department report and photographs, as well as the hospital emergency room records, were reviewed.[2] The report concluded as follows:

CONCLUSION:

It is our opinion that Richard Fournier, a 24 year old white male, died of multiple injuries, including mandibular and maxillary fractures, contusions and abrasions of the face, subgaleal hemorrhage and abrasions of the chest and extremities. Cerebral edema and subarachnoid hemorrhage resulted from the injuries although no cranial fractures, brain contusion, or subdural hemorrhage were seen. The decedent was beaten by assailants in a parking lot on Mineral Spring Avenue, North Providence, on November 2, 1980 at approximately 1:00 a.m. He was found with shallow respirations and a weak pulse. He was taken by Rescue to Roger Williams General Hospital where he died at 1:47 a.m.

MANNER OF DEATH: Homicide[3]

Dr. Zirkin was not brought back from Israel to testify at the trial. He was not, moreover, deposed before departing for Israel, although the prosecution and the defense knew before he left that he was leaving the United States permanently. In place of Dr. Zirkin, the prosecution offered Dr. Burns, one of the other signatories to the report, indicating he would either (1) lay a proper foundation for admission of the autopsy, as keeper of the records for the Office of State Medical Examiners; or (2) testify as to the cause of death, being an expert qualified to speak to the substance of the report. The court required the prosecution to choose which of these

---

2. The autopsy report summarized outside sources for the information contained in the report as follows:

PROCEDURES AND SPECIMENS: The report and photographs of the North Providence Police Department are reviewed. The emergency room record of Roger Williams General Hospital is reviewed. Multiple x-rays and photographs are taken. Approximately, 20 cc. of antemortem blood, 60 cc. of postmortem blood, 40 cc. of urine and 5 cc. of vitreous are submitted for chemical and toxicologic studies. Bile and gastric content are saved. Fingerprints are obtained by the North Providence Police Department.

3. The relevant portions of the Rhode Island statute, R.I.Gen.Laws § 23–4–1 *et seq.* (1985), establishing the Office of State Medical Examiners are attached hereto as an Appendix. The statute provides for the appointment of a chief medical examiner and assistant medical examiners with authority to perform autopsies where they suspect that the manner of death could be homicide, suicide, casualty, infection or certain other causes. The Office of State Medical Examiners is responsible to maintain "a written determination of the causes of death" and "complete records" thereof.

two roles Dr. Burns would play. The prosecution elected the former and was thereafter required to limit its questioning of him to that role. Likewise, the defense was not allowed to cross-examine Dr. Burns as to the substance of Dr. Zirkin's conclusions, nor to qualify him as an expert during cross-examination. The court invited the defense to call Dr. Burns as its own witness if it wished to have him testify in relation to the substance of the report. The defense did not do so.

### I.

#### A. Analysis Under Ohio v. Roberts

■ The petitioner, as did the district court, relies heavily upon *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), in arguing that the Confrontation Clause of the Sixth Amendment was violated by the admission into evidence of the autopsy report without the presence and testimony of Dr. Zirkin, the medical examiner who performed the autopsy and prepared the report. At issue in *Ohio v. Roberts*, was the admissability of an absent witness's former testimony at a preliminary hearing. The Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The *Roberts* Court noted, "If one were to read this language literally, it would require, on objection, the exclusion of any statement made by a declarant not present at trial.... But, if thus applied, the Clause would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." 448 U.S. at 63, 100 S.Ct. at 2537.[4]

In *Roberts*, the Court said the Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, it "establishes a rule of necessity" that in the usual case requires the prosecution either to produce, or demonstrate the unavailability of the declarant. And second, once the witness is shown to be unavailable, the Clause "countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule'...." *Id.*, 65, 100 S.Ct. at 2539. The Court summarized:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability."[5] Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66, 100 S.Ct. at 2539 (footnote added).

The *Roberts* Court went on to note that a declarant becomes unavailable for confrontation purposes when the prosecutor has made a good faith effort to produce the declarant at trial, *Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543 (citing *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1321–22, 20 L.Ed.2d 255 (1968)). Thus, under *Roberts*, admission of the autopsy report would conform to the Confrontation Clause only if the medical examiner who prepared it were shown to be unavailable and the report were found to bear adequate indicia of reliability. The Supreme Court of Rhode Island upheld express findings of the trial court both that Dr. Zirkin, the preparer of the report, was unavailable because he "was residing in Israel and was no longer connected with the Office of the Medical Examiner," *State v. Manocchio*, 497 A.2d 1, 5 (R.I.1985), and that "the 'underlying trustworthiness' surrounding the generation of the autopsy report justified its admission." *Id.* at 8.

---

**4.** The Supreme Court has long recognized that certain forms of hearsay evidence may be received without violating the Confrontation Clause. *See, e.g., Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895) (admitting stenographic notes of prior testimony of a deceased witness).

**5.** This phrase originated in *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) and has been quoted numerous times subsequently.

The district court disagreed. It found that the state had not made a good faith effort to obtain Dr. Zirkin's testimony. He could easily have been deposed before he departed for Israel, said the court, or he could have been brought back from Israel to testify at the trial. The district court did not focus on the reliability, as such, of the autopsy report. However, it gave as a further ground for rejecting it the fact that it contained not only medical opinions but also a "factual conclusion," *id.* at 478, (specifically, that decedent was beaten by unspecified assailants in a certain parking lot shortly before his death, information that the examiner had presumably obtained from the police report), as well as the examiner's conclusion that the manner of death was homicide. The district court stated,

> Since petitioner was found guilty of manslaughter and since the only evidence of the *corpus delicti* [here, that the beating caused the death] was the opinion of an absent Medical Examiner, the conclusion is inescapable that the jury acted on the information and conclusions stated in the Medical Examiner's Report. This is error of constitutional dimension.

708 F.Supp. 473, 478.

While the Rhode Island Supreme Court and the district court joined issue on whether Dr. Zirkin was available, we do not find it necessary to resolve that question. Recent Supreme Court precedent indicates that, while reliability continues to be a key factor in Confrontation Clause analysis of hearsay, the declarant's availability, in a case like the present, is not. We explain why this is so.

B. *The Roberts Test as Modified by Inadi: Unavailability Is Not a Constitutional Prerequisite*

■ In *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Court declared that *"Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable." *Id.* at 394, 106 S.Ct. at 1125. It held that

co-conspirator statements of a non-testifying declarant could be admitted without a showing of unavailability. We believe that *Inadi* is controlling here.

The Court limited *Roberts* to its own specific situation of former testimony, explaining that unavailability was relevant in that context because former testimony seldom had independent value of its own, being simply an inferior substitute for present, live testimony. There is, therefore, little justification for relying on former testimony if the declarant is available to testify in person. When two versions of the same evidence are available, the Court said, confrontation principles *"favor the better evidence," Inadi,* 475 U.S. at 394, 106 S.Ct. at 1126 (emphasis added). But while live testimony is better than former testimony, it is not necessarily better than the type of co-conspirator hearsay at issue in *Inadi.* Being made while the conspiracy was in progress, such statements would provide evidence of the conspiracy's context that could not be replicated, even if the declarant testified to the same matters in court. *Id.* at 394–95, 106 S.Ct. at 1125–26. Such statements are "made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence." *Id.* at 396, 106 S.Ct. at 1126.

The reasoning in *Inadi* applies equally well to distinguish the former testimony of *Roberts* from most of the other hearsay exceptions, such as—for example—business records or public records. *See* Jonakait, *Restoring the Confrontation Clause to the Sixth Amendment*, 35 UCLA L.Rev. 557, 561 (1988) (*Inadi* supports the general proposition that reliable out-of-court statements generally can be constitutionally introduced without producing an available declarant). While an autopsy report, strictly speaking, does not fall within the category of a clearly recognized hearsay exception, *infra,* it shares most of the features of both the business records and the public records exceptions, *see* Fed.R.Evid., 803(6) and (8); and the reasoning of *Inadi* similarly applies. As one commentator puts it,

> Former testimony is exempted from the general prohibition on hearsay because it

incorporates cross-examination and can, therefore, be evaluated nearly as well by the trier of fact as can in-court testimony. Other hearsay is exempted, however, [from the presence-if-available requirement] because the circumstances in which it was uttered make that class of hearsay more reliable than hearsay generally. The evidentiary value of all the other admitted hearsay depends on the context in which it was made. Just as in-court testimony is not a replacement for coconspirator statements, neither is it a replacement for any admissible hearsay, except for former testimony.

Jonakait, 35 UCLA L.Rev. at 562 (footnotes omitted).

In the case of a business record, the context in which the hearsay was made (a record entered in the routine course of "business," broadly defined), may cause the jury to consider the record to be of greater value than the in-court testimony. Id. at 562–63. Thus, "if the jury accepts ... that such documents have 'unusual reliability,' [citation omitted] the in-court testimony will not be a mere substitution for the hearsay." Id. at 563 n. 28.

Like reasoning applies to autopsy reports, assuming they are otherwise admissible. If any length of time has passed since the performance of the autopsy, the medical examiner will probably not remember the autopsy and its results independently from the report itself. His detailed descriptions of the condition of the body, and often his judgments will be superior at the time he writes the report to any he could make later; he will ordinarily be able to testify only by reference to the report. Further, the routine, standardized conditions under which such reports are prepared, as well as the fact that the medical examiner is exercising a special responsibility which the law assigns to him, assure their independent reliability.[6]

To be sure, the introduction of an autopsy report in tandem with live testimony by its preparer might be the optimum course, but in Inadi the Court did not require such an ideal course, but rather permitted admission of the hearsay by itself where its independent reliability warranted. The Court, in Inadi, pointed out that an unavailability rule would not offer any significant benefits. The only time such a rule would act to exclude evidence is when "the prosecution makes the mistake of not producing an otherwise available witness," id. at 396, 106 S.Ct. at 1127, since the evidence could come in anyway whenever unavailability was demonstrated. If an available declarant were important to the defense, the defendant could employ his rights under the Sixth Amendment Compulsory Process Clause to force the declarant to attend the trial and testify. Very little could be gained by a rule requiring the prosecution to present an available declarant where the defendant chose not to summons the declarant. Id. at 396–98, 106 S.Ct. at 1126–27. Still another reason given by the Inadi court was to avoid the additional burdens on prosecutors and on the courts that

6. An illustrative example is Montgomery v. Fogg, 479 F.Supp. 363 (S.D.N.Y.1979), a case in which the district court denied habeas corpus relief which had been sought in part on the basis that admission of an autopsy report at trial without testimony by those who performed the autopsy impinged upon the right of confrontation. Judge Weinfeld found such reports to be official records with sufficient "indicia of reliability" to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." (citing Mancusi v. Stubbs, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972)) Id. at 370. The court explained:

The autopsy reports in the instant case are official records kept in the regular and usual course of the performance by the medical examiner of his official duties. Their reliability is underscored by the rigid requirements of the New York statute that the examiner who performs the autopsy be a "doctor of medicine and a skilled pathologist and microscopist," and that he record and specify in detail his findings. [N.Y.County Law §§ 670–78 (McKinney's 1972)] They meet every indicia of reliability and thus afford a fact-finder a basis for evaluating the information. Indeed, if business records are admissible as an exception to the hearsay rule because they have the "earmarks of reliability" or "probability of trustworthiness" (citing Palmer v. Hoffman, 318 U.S. 109, 113–14 [63 S.Ct. 477, 480–81, 87 L.Ed. 645] (1943)) then, a fortiori, public records kept pursuant to statute carry greater weight of reliability.

Id. at 370–71.

would result from an unavailability rule.[7] *Id.* at 398–400, 106 S.Ct. at 1127–28. This reasoning would apply here equally.

We conclude that *Inadi* effectively limited the unavailability prong of the *Roberts* test to a narrow type of hearsay exception different from the present case. We are left, therefore, with reliability as the determining factor for the admissibility of the autopsy report under the Confrontation Clause.[8]

## C. *Reliability of the Autopsy Report*

 Reliability may be demonstrated in one of two ways: by showing that the evidence falls within a firmly rooted hearsay exception [9] or by showing that the evidence possesses particularized guarantees of trustworthiness,[10] *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. The first question becomes, thus, whether autopsy reports fall within a firmly rooted hearsay exception. In favor of that proposition is the fact that autopsy reports, like hospital records, fit conceptually within the long-es-

tablished exception for business records. *See* Fed.R.Evid. 803(6), admitting, *inter alia,* medical reports and "diagnoses." Autopsy reports, however, may also contain information going beyond purely medical evaluations. The examiner may not only state the *medical* conditions causing death but may give his opinion as to whether death was caused by homicide, suicide, casualty, or other outside cause. *See* R.I. Gen.Laws § 23–4–4. The latter may involve hearsay contained in police investigations. *Compare* Fed.R.Evid. 803(8) (excluding public records of "matters observed by police officers and other law enforcement personnel"). The literature, moreover, does not indicate that autopsy reports are widely acknowledged as coming within a clearly established exception.

The Rhode Island Supreme Court declared in this case that autopsy reports qualify as admissible hearsay exceptions under Rhode Island evidence law. *State v. Manocchio,* 497 A.2d at 6. Although the Federal Rules of Evidence had not yet been adopted in Rhode Island at the time of this

---

**7.** For example, "[a] rule that required each invocation of [the coconspirator hearsay exception] to be accompanied by a decision on the declarant's availability would impose a substantial burden on the entire criminal justice system." *Id.* at 399, 106 S.Ct. at 1128. Further,

> [f]or unincarcerated declarants the unavailability rule would require that during the *sometimes lengthy period before trial* the Government must endeavor to be aware of the whereabouts of the declarant or run the risk of a court determination that its efforts to produce the declarant did not satisfy the test of "good faith." [citations omitted].

*Id.*

**8.** In *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), decided after *Inadi,* the Court found that it did not need to address the question of the availability of the codefendant whose confession had been introduced against the defendant, because the confession did not bear sufficient independent "indicia of reliability" to overcome the presumption of unreliability that attends such accomplice confessions. This statement does not cut one way or the other on the current significance of availability as a necessary criterion.

**9.** In *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the Supreme Court held that co-conspirator statements could be constitutionally admitted against a defendant for the reason that they fell within a firmly

rooted hearsay exception and could thus be considered reliable even without an independent inquiry into their specific reliability:

> We think that the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that, under this Court's holding in *Roberts,* a court need not independently inquire into the reliability of such statements.... Accordingly, we hold that the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of [the co-conspirator hearsay exception].

483 U.S. at 183, 107 S.Ct. at 2783 (footnote omitted).

**10.** Admissibility of hearsay evidence under an exception to the hearsay rule of either the common law of evidence of a state or the Federal Rules of Evidence is not an absolute prerequisite to its admissibility under the Constitution. The Supreme Court, in *Lee v. Illinois,* held that hearsay not falling within a firmly rooted exception is "presumptively unreliable and inadmissible for Confrontation Clause purposes, [but] may nonetheless meet Confrontation clause reliability standards if it is supported by a 'showing of particularized guarantees of trustworthiness.'" 476 U.S. 530, 543, 106 S.Ct. 2056, 3063, 90 L.Ed.2d 514 (1986) (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)).

case, the Rhode Island Supreme Court had specifically adopted Rule 803(6) (records of regularly conducted activity)—the business records exception—in an earlier decision, and it held that autopsy reports fell within that exception. *Id.* It also stated that autopsy reports would be admissible under Rule 803(8)(B) [11]—the public records exception—as well, had the Federal Rules of Evidence been adopted in Rhode Island. *Id.* [12]

■ Petitioner argues that the autopsy report should be specifically excluded here as produced by "police officers and other law enforcement personnel." We believe the Rhode Island Supreme Court was correct in rejecting this argument, finding

a medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case.

*State v. Manocchio,* 497 A.2d at 7. *See also United States v. Hansen,* 583 F.2d 325, 333 (7th Cir.1978), *cert. denied,* 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) *but cf. United States v. Oates,* 560 F.2d 45, 68 (2d Cir.1977). To the extent the report, in addition to medical observations, incorporates inadmissible matters based on police reports, these can be redacted. *Infra.*

Other courts have also rejected challenges under the Confrontation Clause to the admissibility of autopsy reports where the medical examiner was not produced. *See Montgomery v. Fogg,* 479 F.Supp. at 370–71 (allowing autopsy report despite absent medical examiner where there was no bona fide contention as to cause of death); *State v. Damon,* 570 A.2d 700, 214 Conn. 146, 157–59 (1990) (autopsy report admissible as business record of objective facts and observations, regardless of pathologist's availability, who was vacationing in

India during the trial); *Collins v. State,* 267 Ind. 233, 369 N.E.2d 422 (1977) (admission of autopsy report as public record did not violate Confrontation Clause despite absence of preparer). But these cases fall short of establishing that autopsy reports, as such, are a firmly rooted hearsay exception. Because such reports may contain the examiner's views as to such matters as whether death was caused by homicide and may incorporate information from outside the medical examiner's office, problems are raised going beyond a simple application of the mentioned exceptions. We turn, therefore, to the second question, whether they possess "particularized guarantees of trustworthiness."

■ For reasons discussed in the following section, we hold that the autopsy report presented in this case possessed sufficient "particularized guarantees of trustworthiness" that its admission in the absence of live testimony by its preparer did not offend the Confrontation Clause. We emphasize the following factors: (1) The report was properly authenticated at the trial as having been prepared by a qualified physician under the auspices of the Medical Examiner's Office in accordance with the statutory requirements and the established medical procedures of the Office; (2) There has been no showing of a possible motivation on the part of the examiner to falsify the report; (3) The report's inclusion and incorporation of double hearsay from a non-medical, non-laboratory police report was, at worst, harmless error beyond a reasonable doubt because the accuracy of the included information was not in issue; (4) Similarly, the report's conclusion of "homicide," in these circumstances, amounted to no more than a restatement of the examiner's medical conclusion that death resulted from the multiple injuries observed on the decedent's body.

**11.** Rule 803(8)(B) allows in "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, *excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel"* (emphasis added). *See*

*also* (8)(C) of Rule 803, indicating that, under the public records exception, governmental investigative findings are not admissible against a criminal defendant.

**12.** Rhode Island has since adopted the Federal Rules.

### D. "Particularized Guarantees of Trustworthiness" of Autopsy Reports

Petitioner argues in his brief that autopsy reports such as the one under consideration lack particularized guarantees of trustworthiness because, although they may contain elements that are in the nature of routine records—which have been recognized as possessing adequate indicia of reliability because they are a firmly rooted hearsay exception—they also contain such elements as factual conclusions and subjective expert opinions: "The autopsy report here was an unstable conglomeration of observed physical facts, hearsay reiterations of third party observations, including double hearsay reports from civilian witnesses, medical conclusions, and conclusions about the ultimate facts of the case."

To deal with this argument, we examine separately the categories of statements included in the autopsy report as follows: (1) descriptive observations of the condition of the corpse, (2) medical opinions as to the nature of any injuries or illnesses as well as conclusions as to the medical cause of death based upon these opinions, (3) statements as to circumstances surrounding the death taken from police reports or other sources, and (4) the medical examiner's final conclusion as to "manner of death," *viz.*, "homicide."

### 1. Category-One Statements: Descriptive Observations as to the Condition of the Decedent's Corpse

■ Statements in the autopsy report falling into this category [13] are reliable for all of the reasons that routine business records or public records are deemed reli-able. Like the information contained in business records, the reliability of the descriptive observation portion of autopsy reports prepared by state or county medical examiners' offices is enhanced by the routine and repetitive circumstances under which such reports are made. And since the reports are made at the time of the autopsy, their reliability is far greater than a later-recollected description by the preparer of the record.[14] Like information contained in public records, reliability is further enhanced by the existence of statutorily regularized procedures and established medical standards according to which autopsies must be performed and reports prepared, and by the fact that autopsies are carried out in a laboratory environment by trained individuals with specialized qualifications. *See* R.I.Gen.Laws § 23-4-1 *et seq.* (1985) set forth in Appendix.

Dr. Burns, the Deputy Chief Medical Examiner, who testified at the trial, authenticated the report and established that it was prepared under the auspices of the Medical Examiner's Office in accordance with the statute and the established medical procedures of the Office. He described the statutory mandate of the Office of the Medical Examiner, the way in which this mandate is carried out, and the generalized procedures of the Office regarding conduct of autopsies and preparation of the reports.

It happened in this case that Dr. Burns also had personal familiarity with this autopsy, qualifying him to testify to more than just the general procedures for conducting autopsies and preparing autopsy reports.[15] He had taken part in a confer-

---

**13.** An example of such descriptive observations taken from the autopsy report in this case follows:

A faint, irregularly shaped, purple contusion measuring 2½ by 1½ inches is present on the left side of the forehead. Two abrasions are present on the right side of the forehead.

**14.** In the present case, even if Dr. Zirkin had been called as a live witness, he would most likely have been forced to base his testimony upon his own written autopsy report because of the large numbers of autopsies that medical examiners perform and because of the length of

time that passed between the time of performing the autopsy and the time of trial. In Dr. Zirkin's earlier testimony before the Grand Jury in the same case, he stated, "If I may refer to my notes," and took his answers thereafter directly from the report.

**15.** Personal familiarity with the autopsy report in question, however, is not a prerequisite to being qualified to authenticate the report by showing that it was prepared under the auspices of the Office of the Medical Examiner according to established medical procedures and the statutory mandate.

ence held by the medical examiners with Dr. Mary Ambler, who did the examination of the formalin fixed brain which formed the core of the report; and he had signed the report even though he did not personally perform the autopsy.

The objectivity and impartiality of Dr. Zirkin and those associated with him, and of their methods in performing the autopsy and detailing their observations, are not in issue.[16] There is no reason not to believe that Dr. Zirkin and his associates did not discharge their professional and official obligations under the statute. Their descriptive observations of the physical condition of decedent thus possess "particularized guaranties of trustworthiness" for all the reasons that attach to business and public records.

2. Category–Two Statements: Medical Opinions as to the Nature of Injuries or Illnesses including Medical Conclusions as to the Cause of Death Based upon These Opinions

 Like their descriptive observations, we believe Dr. Zirkin's opinions and conclusions regarding the *medical* cause of death are admissible: they reflect the pathologist's expert medical judgment, following an autopsy, as to the cause of death, a subject he was both professionally and by

law charged with ascertaining and recording. Dr. Zirkin gave as the medical cause of death, "multiple injuries including mandibular and maxillary fractures, contusions and abrasions of the face, subgaleal hemorrhage resulted from the injuries although no cranial fractures, brain contusion, or subdural hemorrhage were seen." These conclusions followed upon Dr. Zirkin's detailed physical findings in respect to the nature and appearance of the observed injuries and related medical conditions. *See, e.g.,* n. 13, *supra.*

Petitioner argues that Dr. Zirkin's conclusion that death was caused by the injuries is suspect as it was based not only on examination of the corpse, but upon certain hearsay evidence. Thus, Dr. Zirkin considered the results of the formalin fixed brain analysis performed by Dr. Mary Ambler. He also reviewed the report and photographs from the police department and the emergency room records of the Roger Williams General Hospital to which the decedent had been brought and where he died. We believe, however, that Dr. Zirkin's exposure to these extrinsic materials was appropriate and enhanced rather than undercut the trustworthiness of the autopsy report. In this regard, we distinguish between the pathologist's determination of the medical cause of death, i.e., "multiple

---

**16.** In the Federal Rules of Evidence, both the business and public records exceptions provide for rejection of the evidence where "the source of information or the method or circumstances of preparation" indicate lack of trustworthiness. *Stevens v. Bordenkircher,* 746 F.2d 342 (6th Cir. 1984), serves to illustrate how an autopsy report lacking in proper authentication and suspect as falsified would not be sufficiently reliable under the Confrontation Clause. In *Stevens,* the admission of an autopsy report without the testimony of its author at trial was held to be prohibited under the Sixth Amendment because of a "substantial risk that the jury would infer improperly that the information contained in the document resulted from the coroner's independent evaluation of the evidence." *Id.* at 348. The document purported to be based upon an autopsy that revealed the identity of the body and the cause of death; but in reality, the information that the decedent was shot was given to the coroner by the sheriff, and no autopsy was performed to verify it.

At petitioner's trial, the death certificate purported to be a statement by the absent coro-

ner that an autopsy revealed the identity of the body, the cause of death, and the approximate date of death. At the evidentiary hearing, however, ... [the coroner had] indicated that he did not perform an autopsy on the remains and found no evidence of bullets or metallic fragments from an x-ray of the remains. [He] further stated that he could not determine the identity of the body, the cause of death, the date of death, whether the death occurred as a result of homicide, or whether the death resulted from one or more gunshot wounds inflicted by an alleged assailant. Moreover, the coroner disclosed that he had discussed these facts with the prosecutor prior to trial.

*Id.* at 345–46 (footnote omitted).

The autopsy report in *Stevens* was not based on an autopsy of any kind, and it falsely created the impression that its contents reflected the coroner's independent medical conclusions based on such an autopsy. Such showings would clearly justify excluding this particular report from evidence for Confrontation Clause reasons.

injuries" as described, and his conclusion as to "manner of death," namely "homicide." The latter raises different issues which we shall discuss later.

Fed.R.Evid. 703 allows expert testimony to be based upon otherwise inadmissible evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." Rule 703 reflects a recognition of the expert's integrity and specialized skill, which "will keep him from basing his opinion on questionable matter." J. Weinstein and M. Berger, Weinstein's Evidence ¶ 803(4)[01] at 803–146 (1990). *See also United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir.1971) (en banc). Medical examiners are physicians, and physicians commonly base their opinions on tests and examinations performed by other physicians: for example, the reading of an x-ray by a radiologist. Thus, it was reasonable for Dr. Zirkin to consider the results of a brain analysis conducted by another physician as well as of laboratory tests and the like. Physicians also like to know how and when a patient was injured in order better to interpret the patient's observed condition. Thus, here Dr. Zirkin mentioned the police report of a beating at 1 a.m., of decedent's being found with shallow respirations and a weak pulse, and of his being taken by Rescue to Roger Williams General Hospital where he died at 1:47 a.m. This is the type of information a physician charged with Dr. Zirkin's responsibility would reasonably want to know, for whatever assistance it might provide in interpreting and verifying the results of the autopsy. The examiner would, of course, also want to see any hospital records pertaining to decedent's condition and treatment up to death. Such records are themselves independently admissible under the business records exception, a "firmly rooted" exception to the hearsay rule. *See* Fed.R.Evid. 803(6).

There is, moreover, a close analogy between the admission of medical records containing "diagnoses," as specifically allowed under Fed.R.Evid. 803(6) and admission of the autopsy report in issue here. A determination of the cause of death following autopsy is, in effect, a medical diagnosis prepared by the pathologist pursuant to law for important societal purposes. Petitioner's objections to admission of the autopsy reports—that expert qualifications and accuracy of opinion cannot be adequately evaluated without cross-examination of the author of the opinion—are identical to those once made opposing the admission of medical records. Weinstein's Evidence, ¶ 803(6)[6] at 803–198 (1989). However, hospital records, including medical opinions, are now admitted under Rule 803(6), which expressly permits "opinions" and "diagnoses." We believe that hospital records containing statements of medical opinions constitute a "firmly rooted exception" to the hearsay rule, and thus would pass Confrontation Clause scrutiny.[17] The autopsy report opinion as to cause of death was no more or less prone to error than medical opinions found in such hospital records. Medical opinions as to the nature of injuries or illnesses[18] and medical con-

---

**17.** Historically, admissibility of opinion in medical records posed a troublesome issue. Nevertheless, current practice, approved by McCormick, Wigmore, Weinstein and leading commentators, is to admit such evidence. Weinstein states:

> Rule 803(6) in accord with the trend of state decisions and the conclusion of leading legal authorities rejects any attempt to exclude a particular class of hospital records. Diagnoses and opinions, without restriction to routine vis-a-vis conjectural, or physical as against psychiatric, are included as proper subjects of admissible entries in addition to acts, events and conditions.

Weinstein's Evidence, ¶ 803(6)[6] at 803–200 (1989) (footnotes omitted). In *Phillips v. Neil,*

452 F.2d 337 (6th Cir.1971), the court of appeals found that admission of psychiatric hospital records opining the sanity of the defendant violated the Confrontation Clause. However, this case is distinguishable due to its emphasis on the conjectural nature of psychiatric diagnosis, the failure to even identify the authors of the psychiatric reports, and absence of any explication of the facts or reasoning process upon which the opinions and conclusions were based. *Phillips,* 452 F.2d at 347.

**18.** There is a continuum between simple medical descriptions, as discussed under category one, and observations involving expert opinions. An example from the autopsy report in question of a medical opinion as to the nature of the injuries is as follows:

clusions as to the cause of death, *see supra;* p. 772, are based upon a common body of medical knowledge applied by physicians who possess relevant medical qualifications. Examiners lack any reason to falsify their reports and are motivated as professionals and public officials to reach their conclusions as conscientiously and accurately as possible. Rule 803(6), which was applicable in Rhode Island at the time in issue, authorizes a trial judge to exclude such records where indicia of reliability are lacking, and there may be situations where an autopsy report should be excluded because of indications of unreliability. *See Stevens v. Bordenkircher,* 746 F.2d 342 (6th Cir.1984), discussed in note 16, *supra.* In this case, the trial court, after conducting a voir dire inquiry as to reliability, found specifically that the report was reliable. We believe, in these circumstances, that the report possesses at least the same indicia of reliability as do commonly admitted hospital records.

As with diagnoses reflected in medical records, adequate means were available to the defendant to bring to the jury's attention any error or flawed conclusions in the medical examiner's opinions. The bases of Dr. Zirkin's judgments are described in the report in detail. The defendant could have had his own medical experts review the report and give a different opinion as to the cause of death. In fact, defendant tendered no experts to support his claim that death may have been due to drug-induced or spontaneous hemorrhage rather than the observed injuries.[19]

The actual preparer of the report was not necessarily any better suited than another equally trained medical examiner familiar with the procedures and medical implications to answer questions as to the medical opinions presented in the report. Petitioner argues that his attempts to cross-examine Dr. Burns as to these very issues were rebuffed by the trial judge in response to the prosecutor's objections. But petitioner's interests were adequately protected by the option, which the judge extended to him, to call Dr. Burns or an outside expert of his own choosing, as witnesses in his case. By these means, defendant could have pressed his argument that death was caused not by the injuries received from the beating but from decedent's use of drugs.

The Supreme Court suggested in *Inadi* that the defendant is further protected from prejudicial hearsay when the defense may subpoena an available declarant:

> [I]f the defense has not chosen to subpoena such a declarant, either as a witness favorable to the defense, or as a hostile witness, ... then it is difficult to see what, if anything, is gained by a rule that requires the prosecution to make that declarant "available."

*Inadi,* 475 U.S. at 398, 106 S.Ct. at 1127–28. Reasoning that imposing a burden on the prosecution to call all such witnesses or demonstrate unavailability was unjustifiable, the Court noted that the defendant's option to call the declarant under the Compulsory Process Clause rendered the benefit of an unavailability rule under the Confrontation Clause slight. Here if the preparer of the autopsy report, Dr. Zirkin, were indeed available, as the district court believed, the defendant could have called him as his own witness or deposed him in Israel or before he departed.[20]

---

The scalp and skull are opened in the usual manner. Subgaleal hemorrhage, measuring 3 inches in length is present in the frontal area and measuring 3½ by 2 inches in the left parietal area. No skull fractures are present. No subdural hemorrhage is seen.

19. The autopsy report noted cocaine metabolite in the urine, and THC (marijuana) in the blood, although it did not mention these substances as possible causes of death.

20. With respect to medical records, Weinstein notes that

the adversary "may himself call the declarant and thus bring out, if he can, any weaknesses of the diagnosis." [McCormick, *Evidence* § 290 at 613 (1954)]. In addition, failure to call the doctor may permit an opponent a field day in showing "shortcomings" in the procedures used which might have been readily explained if the doctor who prepared the report was present; there is a self-limiting feature that minimizes abuse.

*Weinstein's Evidence* ¶ 803(6)[06], at 803–198—803–199 (1990).

We conclude that the examiner's opinion that death was caused by the multiple injuries and subsidiary medical opinions in the report were properly admitted.

3. Category–Three Statements: Statements as to Circumstances Surrounding the Death Taken from Police Reports or Other Sources

■ When the autopsy report went to the jury it contained the statement, that decedent was beaten by assailants in a parking lot on Mineral Spring Avenue, on November 2, 1980, at approximately 1 a.m. *See supra*, p. 772. Dr. Zirkin presumably took this from the police report. In this regard, the district court said:

> In this case, the portion of Dr. Zirkin's report relating to the fight in the parking lot cannot be considered medical opinion. It is a factual conclusion. The report could be and apparently was read by the jury as concluding that the decedent died as a result of the beating in the parking lot, rather than as a result of the subarachnoid hemorrhage. In his grand jury testimony Dr. Zirkin testified that the subarachnoid hemorrhage, swelling and bleeding in the tissue lining the brain, caused the death.

*Manocchio v. Moran*, 708 F.Supp. 473, 478 (D.R.I.1989) at 478. The district court found that the inclusion in the report of the factual conclusions as to the circumstances surrounding the death (as well as the opinion as to manner of death, *see infra*) was fatal to its admissibility.

The district court's criticism would have force if the autopsy report's reference to the beating at the parking lot added materially to the state's case against defendant—as, for example, had the police report identified defendant as one of decedent's assailants or constituted important evidence that a beating had occurred. While the medical examiner was entitled to take into account, for purposes of formulating an overall picture of decedent's medical condition, the police's information that decedent had been beaten shortly before he died, this was inadmissible at trial to prove the state's case against the defendant. Had defendant objected specifically to the report's reference to the parking lot beating, the trial court should have redacted the material, just as it would redact from a medical record any prejudiced hearsay concerning the particulars of a motor vehicle accident that were relayed to the doctor.

The fact that the decedent was beaten by assailants in the parking lot, however, was never seriously contested, nor has it been brought to our attention that the defense ever asked the court to redact the particular portion of the autopsy report referring to a beating. The beating of decedent in the parking lot was testified to at trial by a prosecution eye witness, Jayne Leo. The occurrence of a beating was further supported by the testimony of several other state witnesses, who, while they did not witness the beating, had rushed outside afterwards and ministered to the victim who they found bleeding, injured and dishevelled, lying on the ground in the parking lot, in a state that virtually compelled the conclusion that he had been assaulted and beaten. The "circumstances surrounding the death" portion of the autopsy report did not mention petitioner's name nor did it state implicitly or explicitly that petitioner was in any way involved in the beating. It stated merely that decedent was beaten by assailants at a certain time and place, that he was found with shallow respirations and a weak pulse, and that he was taken to a hospital where he died less than an hour after the beating. Petitioner did not challenge the truth of any of these assertions; he challenged only the state's assertion that the injuries resulting from the beating caused the victim's death, suggesting, instead, that a hemorrhage induced by drug ingestion, or possibly a *spontaneous* hemorrhage, caused death.

In these circumstances, the district court's implication that the autopsy report's reference to the beating misled the jury into believing that the beating, "rather than ... the subarachnoid hemorrhage," caused decedent's death is puzzling: the autopsy report did not reject the subarachnoid hemorrhage as contributing to the death but rather attributed the hemorrhage to the "multiple injuries." As noted, there

was independent and uncontroverted evidence that a beating had occurred. Whether death resulted from the injuries, or from drug use, was strictly a medical question, which reference to the beating did not affect. We thus see no prejudice in the sentence about the beating.

Defendant, indeed, makes no argument that this portion of the report was detrimental to his case because it revealed a beating or linked him to the beating in some manner not fully accomplished by the remainder of the evidence. We conclude, beyond a reasonable doubt, that admission, without redaction, of the portion of the autopsy report repeating this information obtained from the police report was not prejudicial. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Cross-examination of Dr. Zirkin on the particulars of this information, as to which Dr. Zirkin was without personal knowledge, would, moreover, have offered no benefit to the defendant.

E. *Category–Four Statements: The Medical Examiner's Final Conclusion as to "Manner of Death," viz., "Homicide"*

 The autopsy report concluded with the statement: "Manner of Death: Homicide." Homicide is the killing of a human being. Black's Law Dictionary (4th ed. 1968). Homicide may be justifiable, as when done in self defense, or non-justifiable, as when murder or manslaughter. The autopsy homicide conclusion, therefore, implies two things: *First,* human action, i.e., the beating, injured the victim; and *second,* the victim died as a result of these injuries. We discussed the latter component under category two, above, and concluded that the medical examiner's opinion that decedent died as a result of multiple injuries described in the report did not violate the Confrontation Clause. We are

left, then, to decide whether the admission of the report's statement—implicit in the homicide conclusion—that the beating caused the victim's fatal injuries [21] was constitutional error.

In a different case, this question might be a difficult one. If, for example, decedent had fallen from a window, and the question was whether he was pushed out or had fallen accidentally, a medical examiner's finding of "homicide" would likely be inadmissible. Such a finding could be highly prejudicial, since it would contradict defendant's claim of accident, and would almost certainly have to be based on a police report or similar extrinsic evidence. At very least, the medical examiner's presence might be needed for cross-examination on whether the finding of "homicide" rested on medical factors rather than police report hearsay.

Here, however, there is no such difficulty. There is no dispute that decedent was beaten. Defendant's theory is not that decedent's multiple injuries were caused by some accidental cause, such as a fall, but rather that the multiple injuries the victim sustained were not the true cause of his death. Instead, defendant speculates—although without offering any expert evidence in support—that the victim died as a result of drug ingestion or, possibly, a spontaneous hemorrhage. This is a purely medical argument, and, as we have held, medical opinions as to cause of death may be constitutionally presented in an autopsy report just as they may be presented in a hospital record. Defendant could refute the examiner's opinion as to cause of death by presenting the opinions of his own experts.

Thus in the circumstances of this case, we see no Confrontation Clause problem in permitting the medical examiner's finding of "homicide" to reach the jury. The finding simply reflected the examiner's opinion that injuries received in an unquestioned

---

**21.** The autopsy conclusion, read in its entirety, implies that the fatal injuries resulted from the beating at issue here. The "homicide" conclusion, logically, only means that his injuries resulted from some human force, possibly including an earlier beating. Nevertheless, in light of the reference to a specific beating in the report, the inescapable force of Dr. Zirkin's conclusion is that the victim died as a result of that beating.

beating—rather than some other medical cause—had caused death.[22]

While, therefore, we question the admissibility of an autopsy report's conclusion that a fatal injury was due to "homicide," we believe that its admission here was, at worst, harmless error beyond a reasonable doubt.

## CONCLUSION

The admission of this autopsy report in the absence of testimony by its preparer did not violate the Confrontation Clause—even though autopsy reports are not a firmly rooted hearsay exception. The contribution of the present report to the state's case lay in presenting the medical examiner's findings and conclusions, following autopsy, as to the medical cause of death. A report covering such matters possesses sufficient particularized guaran-tees of trustworthiness to be received in evidence regardless of the absence of the medical examiner who wrote it and performed the autopsy.

In so holding, we caution that when autopsy reports are allowed into evidence, care must be taken to redact information therein going beyond medical data and evaluation that may violate the constitutional rights of the accused. In the present case, the information as to a beating and the examiner's conclusion of "homicide" were of questionable admissibility. However, for reasons stated, redaction was unnecessary or, at least, the failure to redact was harmless beyond a reasonable doubt.

The decision of the district court granting a writ of habeas corpus under 28 U.S.C. § 2254(d)(2) is reversed. The case is remanded to the district court with directions

---

**22.** Dr. Zirkin's testimony before the grand jury suggests that while the prime focus in reaching his conclusion of homicide were his observations as to the state of the corpse at the autopsy, he took into account the reported beating, finding this consistent with these observations. Excerpts from that testimony are as follows:

A: The internal examination revealed hemorrhage within the scalp as well as cerebral edema and sub-arachnoid hemorrhage. In other words, there were swelling of the brain and hemorrhage within the lining, the tissue lining the brain called the arachnoid. This was a result of blows to the heal, (sic) although there was no fractures of the skull itself, the cranial vault in which the brain sits.

Q: If you get blows to the head, it damages the brain, the brain swells?
A: Yes, sir, that is correct.
Q: And you found that from your autopsy?
A: That is correct.
Q: From a medical standpoint would indicate to you that he had received some trauma, some force—the bone not bring (sic) broken, what sort of an object would do this to him?
A: Any blunt instrument could do this or perhaps a fall on the pavement could explain that.
Q: All right, a blunt instrument, all right. Could it be fists?
A: Yes, sir, it could be.
Q: A board, a stick?
A: Yes, sir, it could be those.

. . . . .

Q: All right, what injuries which you found would be termed fatal?
A: The fatal injuries were perhaps more the result of the beating on the head and that includes the cerebral edema and the sub-arachnoid hemorrhage.

Q: All right, and after concluding your external and internal examination coupled with medical certainty and your experience did you come and give the cause of death and also the manner?
A: Yes, sir, the cause of death was multiple injuries and the manner of death was homicide.
Q: All right, now the cause of death, would it be directed also to the cranium and the brain and you talked about blood, what was it that actually killed him?
A: The death was actually caused by the sub-arachnoid hemorrhage, in other words, hemorrhage in the tissue which lines the brain.

. . . . .

Q: How about the feet, could he have been kicked to death?
A: It is possible that he could have been kicked and the kicking could have caused injuries severe enough.

. . . . .

Q: Did you get a history on this case?
A: Yes, sir, I did ... the history that I have is that the decedent was beaten by assailants in a parking lot on Mineral Spring Avenue in North Providence on November 2nd, 1980, at approximately 1:00 a.m. He was found with shallow respirations and a weak pulse. He was taken by the rescue squad to Roger Williams General Hospital where he died at 1:47 a.m. on November 2nd, 1980.

. . . . .

Q: And what you've told us about the examinations of your autopsy, is that consistent with what the history says caused the ...? (Last word inaudible to transcriber)
A: Yes, sir, that is entirely consistent.

that the petition for a writ of habeas corpus be denied.

*So ordered.*

## APPENDIX

## CHAPTER 4
### OFFICE OF STATE MEDICAL EXAMINERS

SECTION
23–4–1. Definitions.
23–4–2. Establishment of office.
23–4–3. Functions.
23–4–4. Jurisdiction.
23–4–5. Chief medical examiner Assistants and other staff.
23–4–6. State medical examiners commission.
23–4–7. Reporting of certain deaths required—Violations—Penalties.
23–4–8. Procedure for investigation of deaths.
23–4–9. Deaths in public places.
23–4–10. Disposition of deceased bodies.
23–4–11. Effects and property of deceased.
23–4–12. Compensation for recovery of body from water.
23–4–13. Accounts of fees and expenses.
23–4–14. Preservation of reports—Tabular reports.
23–4–15. Morgue—Equipment and supplies.
23–4–16. Uniform determination of death.
23–4–17—23–4–25. [Repealed.]

**23–4–1. Definitions.—**(a) The term "cause of death" shall refer to the agent which has directly or indirectly resulted in a death.

(b) The term "manner of death" shall refer to the means or fatal agency that caused a death.

(c) The term "postmortem examination" shall mean examination after death and shall include an examination of the dead body and surroundings by an agent of the office of state medical examiners but shall not include dissection of the body for any purpose.

(d) The term "autopsy" shall mean the dissection of a dead body and the removal and examination of bone, tissue, organs and foreign objects for the purpose of determining the condition of the body, the cause and the manner of such death.

(e) The term "inquest" shall mean an official judicial inquiry before a medical examiner and/or medical examiners jury for the purpose of determining the manner of death.

(f) The term "assistant medical examiner" shall mean a duly licensed doctor of medicine or osteopathy appointed to assist the office of state medical examiners on a part-time basis.

**23–4–2. Establishment of office.—**There is hereby established in the department of health, the office of state medical examiners.

**23–4–3. Functions.—**The office of state medical examiners shall be responsible for:

(1) The investigation of deaths within the state of Rhode Island which in its judgment might reasonably be expected to involve causes of death enumerated in this chapter;

(2) For the conduct of inquests when requested by the attorney general;

(3) For the performance of autopsies, when appropriate, for deaths which in its judgment might reasonably be expected to involve causes of deaths enumerated in this chapter;

(4) For the written determination of the causes of death investigated pursuant to this chapter;

(5) For the presentation to the courts of Rhode Island of expert testimony relating to the cause of death;

(6) For the keeping of complete records, including names, places, circumstances, and causes of deaths, of deaths investigated and reported, copies of which shall be delivered to the attorney general and of which written determinations of causes of death shall be made available for public inspection;

(7) For the burial of bodies for which there is no other existing legal responsibility to do so;

(8) For the development and enforcement of procedures for the pronouncement of death and the transplantation of organs

from bodies of persons who have died within the state of Rhode Island; and

(9) For the maintenance and operation of a centrally located state morgue.

**23-4-4. Jurisdiction.**—The office of state medical examiners shall have authority to make postmortem examinations, to undertake inquests, and to perform autopsies where there may be in its judgment a reasonable belief that the manner of death could be pronounced as:

(1) Death by a homicide, suicide, or casualty;

(2) Death due to a criminal abortion;

(3) Death due to an accident involving lack of due care on the part of a person other than the deceased;

(4) Death which is the immediate or remote consequences of any physical or toxic injury incurred while the deceased person was employed;

(5) Death due to the use of addictive or unidentifiable chemical agents; or

(6) Death due to an infectious agent capable of spreading an epidemic within the state.

**23-4-5. Chief medical examiner—Assistants and other staff.**—(a) The office shall be under the immediate supervision of a chief, who shall be known as the "chief medical examiner" and who shall be a physician licensed under the provisions of chapters 36 or 37 of title 5, as amended, and a qualified pathologist, certified in anatomical pathology by the American Board of Pathology and who has had forensic training or experience. He shall be appointed by the governor with the advice and consent of the state medical examiners commission and shall be subject to removal in the same manner and he shall serve until his successor is appointed and has qualified. The chief medical examiner shall have general supervision over the administration of and shall enforce the provisions of this chapter. He shall recommend to the commission such rules and regulations as he may deem necessary to effectuate the provisions of this chapter.

(b) The chief medical examiner shall appoint with the approval of the director of health such assistant medical examiners and shall hire such other staff as necessary to carry out the provisions of this chapter.

(c) Persons employed full time at the time of enactment of this chapter within the division of medical examiners in the department of the attorney general shall be transferred to the office of state medical examiners with their former rights and privileges of employment, and shall be eligible for retirement benefits after the age of fifty (50) years and service of twenty (20) years, including service within the division of medical examiners.

**23-4-6. State medical examiners commission.**—(a) There is hereby established the state medical examiners commission.

(b) The commission shall:

(1) Promulgate rules and regulations; and

(2) Hear and determine appeals to decisions by chief medical examiners regarding the undertaking of investigations, inquests and autopsies, and shall advise the chief medical examiner on matters of public concern.

(c) The commission shall consist of fourteen (14) members, ten (10) of whom shall be ex officio members, viz., the director of health, the attorney general, the superintendent of state police, the president of the Rhode Island Medical Society, the president of the Rhode Island Society of Pathologists, the president of the Rhode Island Bar Association, the vice president of the Brown University Division of Biological and Medical Sciences, the president of the Rhode Island Funeral Directors Association, the chairman of the Rhode Island House of Representatives H.E.W. committee, the chairman of the Rhode Island Senate H.E.W. Committee, or the designee of each of the aforementioned members, and four (4) citizens of the state to be appointed by the Governor for the term of three (3) years. Each citizen member shall hold office for the term of his appointment and until his successor shall have been appointed. Vacancies for citizen members shall be filled by appointment for the unexpired

term only. Any citizen member of the commission may be removed from office by the Governor for cause, upon notice and opportunity to be heard.

(d) The director of health and the attorney general shall be the chairman and vice chairman, respectively, of the commission. The chief medical examiner of the office of state medical examiners shall serve as the executive secretary of the commission, and the expenses of the commission shall be a responsibility of the department of health. The commission shall meet at the call of its chairman and at least four (4) times each year, the time and the place for such meeting to be fixed by the chairman.

**23-4-7. Reporting of certain deaths required—Violations—Penalties.—**
(a) Where any person shall die in any manner to suggest the possibility of a criminal act or as the result of violence or apparent suicide, or from a criminal abortion or in any suspicious or unusual manner; it shall be the duty of any person having knowledge of such deaths to immediately notify the police of the city or town where the body of the deceased person lies or to notify the office of state medical examiners. The same procedure shall be followed upon discovery of anatomical material suspected of being or determined to be a part of a human body.

Any person who shall wilfully neglect or refuse to report such death or who without an order from an agent of the office of medical examiners shall wilfully touch, remove or disturb the body of such dead person, or wilfully touch, remove or disturb the clothing, or any article upon or near such body, shall be guilty of a misdemeanor.

(b) If any person shall bury or cause to be buried the dead body of a person supposed to have come to a violent death before the aforementioned notice and before inquiry is made into the manner and circumstances of the death, such person shall be guilty of a misdemeanor.

(c) When any person may appear to have met death when unattended by a physician, or in any unnatural manner, or as the apparent result of the negligence of another person, or as the consequence of any physical or toxic injury incurred while employed, or from the use of any addictive or unidentifiable chemical agent, or from accidental hypothermia, or from an infectious agent capable of spreading an epidemic within the state; it shall be the duty of any physician, law enforcement officer, funeral director, hospital official having knowledge of such death, or of any other person having responsibility for burial or cremation of such deceased person to notify the office of the state medical examiners. In the case of any prisoner committed by law to the custody of the department of corrections or in the department of mental health, retardation and hospitals who dies or in the case of a person who dies while in the custody of the state police or local police departments, the person charged with the responsibility for such custody shall have the duty to notify immediately the office of the state medical examiners. Any person charged with the responsibility of notifying the office of state medical examiners of any of the aforementioned deaths who shall neglect to give such notice shall upon conviction be deemed guilty of a misdemeanor.

(d) If an agent of the office of state medical examiners is of the opinion that a death was caused by the act of neglect of some person other than the deceased, he shall at once notify the attorney general, and the police of the city or town where the body was found or in which it lies. If any person shall be arrested and charged with causing any such death, the person so arrested shall be entitled to receive a copy of the record of the autopsy, as aforesaid, upon written request delivered to the attorney general.

(e) Where any person age sixty-five (65) years or older may appear to have died from accidental hypothermia, said death shall be reported to the department of elderly affairs by the state medical examiner.

**23-4-8. Procedure for investigation of deaths.—**When the office of state medical examiners has notice that there has been found, or is lying within this state, the body of a person who is supposed to have

come to his death by violence, or in any manner as stated in § 23–4–7 above, an agent of the office of state medical examiners shall forthwith repair to the place where such body lies and take charge of same, view the same and make personal inquiry into the cause and manner of death. If such body be found at the residence of the deceased, the agent of the office of state medical examiners shall not remove such body therefrom unless necessary for further postmortem examination or autopsy.

**23–4–14. Preservation of reports— Tabular reports.**—The director of the department of health shall cause the returns received by the office of state medical examiners and reports made by such office on causes of death for each year, in accordance with this chapter, to be bound together with an index thereto. The director of health in his capacity as ex officio state registrar shall prepare or cause to be prepared from the said returns such tabular results as will render them of practical utility, and shall make report thereof annually in connection with the report of births, marriages and deaths required by chapter 3 of this title.