[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE DEFENDANT'S MOTION TO SUPPRESS STATEMENT
The defendant, who is charged with multiple counts of risk of injury to a minor, has moved to suppress oral and written statements he made to state troopers on July 7, 1992. Alleged as grounds for suppression in the motion are the following: CT Page 2340
 1. The defendant did not at any time knowingly, voluntarily or intelligently waive the right to remain silent and the right to the assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States;
 2. Such statements were made in the absence of counsel although the right to counsel had attached.
 3. Such statements were not preceded by proper or adequate warnings of the defendant's rights under the Fifth and Sixth Amendments to the Constitution of the United States.
 4. Such statements were obtained by coercion, deceit and overreaching by the police and none of such statements were made voluntarily.
The motion closes with the admonition that "for all the reasons stated above, any and all such statements, confessions and/or admissions were obtained in violation of the defendant's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution or the United States and the provisions of ArticleFirst 8 of the Constitution of Connecticut.
An evidentiary hearing was held at which the defendant, Troopers Gaffney and McLean and Sergeant Gould testified. In certain respects there were sharp divergences in the evidence. For example, the defendant stated that he felt under strong pressure and coercion to remain at the Prospect Police Building and answer questions and that he was never informed of his rights at any time. The testimony of the police was that at several times during the questioning the defendant was told that he was free to leave and that Trooper Gaffney read the defendant's rights to him as part of the written statement. Upon a review of the entire situation the court has come to the conclusion that in instances of conflict the testimony of the police presents the more rational and logical version of what occurred in the late afternoon and early evening hours on July 7, 1992. Consequently, the court finds that the facts set forth below were established. CT Page 2341
 I.
Troopers Gaffney and McLean are state police detectives assigned to Troop I in Bethany. On July 7, 1992, as part of an assignment to aid the Resident Trooper in Prospect, Gaffney and McLean took statements from the G. children. After taking the statements, they telephoned the defendant's residence and left a message on his answering machine of "we need your help." Later in the afternoon, the troopers, wearing civilian clothes, came to the defendant's house on Cheshire Road in Prospect. The defendant was home alone. The troopers, after identifying themselves, said that they needed the defendant's help in an investigation and asked him to meet them at the Prospect Police Building where the Resident Trooper's office was located. The defendant agreed and drove to the police building in his own car. The troopers followed in their vehicle.
Upon their arrival, the building was locked and they had to wait for five to ten minutes for it to be opened. While waiting outside the building, the troopers were not guarding the defendant who was told that he could leave if he wished.
When the building was opened, they entered, turned left, went through the main office and into a conference room with a table and chairs. No one gave directions as to where to sit. Trooper Gaffney positioned himself at the end of the conference table. Trooper McLean and the defendant sat adjacent to Gaffney but on opposite sides of the table.
Trooper Gaffney started the conversation. He informed the defendant that the Troopers had an investigation involving the defendant's neighbor's children, the G. children. Gaffney continued by stating that the troopers wanted to discuss the matter but that the defendant should understand that he could leave at any time, that there was not going to be any force or duress and that they were going "to talk like gentlemen."
The questioning began with Trooper Gaffney asking about the defendant's work, education and civic activities. The defendant is 63 years old and has been a minister for 37 or 38 years. He has a Bachelor of Arts Degree from Wesleyan and a Master of Divinity Degree from Yale. He has done some graduate work towards a master's degree in child development, family relations and sex education at the University of Connecticut and worked on, but never obtained a doctorate in education at New York University CT Page 2342 from 1976 to 1982. On July 7, 1992, the defendant was the Associate Minister of the First Congregational Church of Cheshire. Previous employments included the United Church Board for Homeland Ministers in New York City and being the minister of the Congregational Church in Prospect.
The defendant has been civically active in Prospect. He was a member of the committee that oversaw the construction and later the expansion of the Prospect Police building. He served on the board of education for region 16. He served on the building committee for the new Prospect Public Library. In some of the defendant's work or civic activities, he had occasions to meet with lawyers. Also, the defendant has friends who are attorneys. There was no evidence, however, to show any previous involvement of the defendant with the criminal justice system.
As the questioning continued, Trooper Gaffney did most of the talking and Trooper McLean took notes. The defendant was asked about his relationship with the G. children. He responded by saying that the G's., as a family, became tenants of a house on his property. He mentioned each of the G. children by name and described how they had picnicked together and exchanged Christmas presents.
The troopers using general terms then informed the defendant of allegations concerning some type of sexual contact by him with the various G. children. The defendant's initial spoken reaction was a denial. But from his expressions and demeanor, the troopers were of the opinion that perhaps there was some truth to the allegations in the childrens' statements. At this point the discussion turned toward the defendant's own past history. He indicated some actions by his brother when they were young that gave the troopers the impression that the defendant, himself, had been a victim of sexual assault or sexual touching.
The statements given by the G. children were in the possession of the troopers. After the defendant finished talking about his brother's actions, the troopers brought up specific subjects from those statements. The defendant said either that something like an incident, described in one or more of the statements occurred or that he could not recall its occurrence or that it did not happen.
At one point during the questioning, the troopers mentioned that other detectives might visit the defendant's wife as they CT Page 2343 were speaking with him. The troopers talked about the visit to see what type of reaction it would bring. In the troopers' view the defendant exhibited a bit of alarm.
Approximately two hours after the defendant and the troopers had entered the Prospect Police Building, Trooper Gaffney announced they would take a break. Sergeant Gould who supervised Gaffney and McLean had come to the police building, and had been sent for coffee. When he returned, the break commenced. During the break, the defendant asked if he could call his wife. He was shown a phone in the outer office from which the call was made. None of the police officers were in the outer office at the time of the telephone call. From the outer office the defendant could have left the building.
Before the coffee break, Trooper Gaffney had said that with the defendant's cooperation, a statement encompassing the various topics that had been discussed could be written. And, if the defendant found the statement to be suitable, he could sign it and it would become his statement. Gaffney did not say to what uses the statement could be put. Nor did the defendant ask what purposes the statement would serve. Gaffney's request for cooperation by the defendant was accompanied by the much-repeated reminder that the defendant could leave at any time.
When the coffee break was finished, the troopers and the defendant reconvened in the conference room leaving Sergeant Gould alone in the outer office. Trooper Gaffney proceeded to write the statement in longhand conferring with Trooper McLean and using McLean's notes, the accuracy of which was checked with the defendant. The defendant was asked repeatedly whether topics or items that had been discussed were, in fact, true. On occasion, the defendant disagreed with the troopers' notes or recitals and offered some adjustments. The defendant's versions were incorporated into Gaffney's writing. Gaffney read aloud what he had written on each topic before going on to the next one. The completed statement is written on six pages. All of the handwriting is Gaffney's except for one correction on page 5 and the last three sentences on page 6 which were written by the defendant.
After completing his writing, Trooper Gaffney read the statement in its entirety to the defendant. The statement was written on a State Police form. The beginning textual paragraph on the statement's first page is printed matter containing the CT Page 2344 "Miranda" and other advisements. With the blank spaces filled in the first paragraph, as read by Gaffney, consisted of the following wordage:
 I, Boardman Kathan, date of birth 10/24/29, of 229 Cheshire Road, Town/City of Prospect, make the following statement, without fear, threat, or promise, knowing that it may be used against me in court. I have been advised of my right to remain silent, that I have a right to consult with an attorney prior to any questioning and to have the attorney present during the questioning, that, if I do talk to the police, I can terminate the questioning at any time; that if I cannot afford an attorney, one will be appointed for me by the court. I understand the above rights and, at this time, waive them. I have also been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157.
After reading the statement, Trooper Gaffney gave it to the defendant who placed it on the table and appeared to be reading it. In 1988, the defendant underwent major surgery in his left eye. A letter from the defendant's ophthalmologist attested to post-surgical conditions of double vision and limited depth perception when both eyes are used which makes for great difficulty in reading with both eyes. On inquiry from the court, the defendant said that he used a copy machine to enlarge words in the preparation of his sermons. At the hearing when the statement was handed to the defendant, the court offered to have the statement enlarged. The defendant responded that an enlargement was unnecessary as he could remove his eyeglasses. The conference room where the questioning occurred and the courtroom have the same type of fluorescent lighting.
As the defendant reviewed the statement, he drew a line through the word "remove" on page 5 and inserted the words "pull down" as a replacement. Another correction appears on page 5. When Trooper Gaffney was reading the statement, he noticed that he had misspelled the word "stroked" and made the correction during his reading. CT Page 2345
When the defendant had completed his review of the statement, he asked if he could add something to it. The troopers gave him a pen and the defendant wrote three sentences on page 6 which read as follows:
 I would like to say that I am very sorry that my intentions that I believed were going to help Spencer were found to make him uncomfortable. Looking back I feel remorse and regret that any of these things ever happen. (sic) BWK It is clear that it was wrong and that I need to enter a counseling program immediately. This has never happened before in all my many years of ministry, working, with hundreds of children and young people in church, youth groups, summer camps and conferences. BWK 7/7/92.
During the questioning Trooper Gaffney had suggested counseling to the defendant.
After the defendant completed his addition to the statement, the troopers asked Sergeant Gould to come into the conference room to take the defendant's acknowledgement. Sergeant Gould asked the defendant if he had read the entire statement and the defendant indicated he had done so. Sergeant Gould then raised his right hand and asked the defendant to raise his. As both right hands were raised, Sergeant Gould asked if the statement were the truth to the best of the defendant's knowledge. The defendant responded affirmatively. Thereupon the defendant signed all six pages of his statement. The two troopers signed as witnesses and Sergeant Gould signed as notarizing officer also on all six pages.
Before the signature line on each page of the written statement is the printed sentence "By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief." This sentence was not included in Trooper Gaffney's reading of the statement. As noted, Sergeant Gould did not read it either although he paraphrased it.
On the first page of the statement, the time started as listed as 1710 and the time ended is listed as 2140. In civilian terms these numbers mean that the troopers started to question the CT Page 2346 defendant at 5:10 and that at least Gaffney's reading of the full statement was completed at 9:40 in the evening. There were, as stated, approximately two hours of questioning and approximately two and one-half hours were spent in formulating the written statement.
In the beginning the troopers and the defendants were the only persons present in the Prospect Police Building. In this time interval, the door to the conference room was left open or ajar. Later when Sergeant Gould arrived, the door was closed. After the statement was notarized, the defendant remained in the building or some minutes talking to one or more of the state policemen before driving away in his own car. Sergeant Gould described the defendant's mood as relaxed.
 II.
Some of the claims for suppression are obviously overbroad. Criminal charges against the defendant were not pending when the troopers spoke with him. The Sixth Amendment right to counsel is "offense-specific" and comes into being only at or after the initiation of adversary judicial proceedings. State v. Birch,219 Conn. 743, 1748 (1991). Further, the four reasons assigned for suppression may he reduced to two: (1) whether the situation required "Miranda" warnings as a precondition to questioning the defendant; and (2) whether the defendant's oral and written statements were voluntarily given.
 A.
In order for the defendant to have been entitled to the warnings constitutionally mandated by Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), two conditions must be found to have coexisted. The defendant must have been in the custody of law enforcement officials and the defendant must have been interrogated. State v. Rosado, 218 Conn. 239, 253 (1991).
The State has studiously avoided using the word "interrogation" preferring to describe the situation as an interview. There is no doubt, however, that the defendant was interrogated as that concept is set forth in Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Interrogation encompasses not only questioning explicitly designed to elicit an incriminating response but also any words or actions on the part of the police that they should know would be CT Page 2347 reasonably likely to elicit an incriminating response from a suspect. Id. at 301, State v. Rosado, supra; State v. Palmer,206 Conn. 40, 62 (1982).
Whether the defendant was in custody when interrogated poses a more difficult question. Parenthetically, the defendant has the initial burden to show custody as well as interrogation. State v. Rosado, supra at 252; State v. Vitale, 197 Conn. 396, 409 (1985).
In Miranda v. Arizona supra at 444, custody was defined as being taken into custody or as being deprived of one's freedom of action in any significant way. Just because the site of an interrogation does not necessarily mean that the interrogation was custodial. Oregon v. Mathiason, 429 U.S. 711, 97 S.Ct. 711,50 L.Ed.2d 714 (1977). The suspect in Mathiason was in the police station for only thirty minutes. But time is only one factor to be considered. There are several Connecticut decisions involving noncustodial interrogatories at police stations with time periods comparable to the instant case. E.G. State v. Damon, 214 Conn. 146,155 (1990) (3-1/2 hours); State v. Green, 207 Conn. 1, 5
(1988) (3-1/2 hours); State v. Acguin, 187 Conn. 647, 652, 654,656 (1982) (approximately 4 hours).
Custody in the sense of Miranda v. Arizona has been equated by our Supreme Court with the concept of a seizure. "A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." State v. Hoeplinger, 206 Conn. 278, 287 (1988) citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870,64 L.Ed.2d 497 (1980). At the hearing, the defendant's testimony was that he felt intimidated and that he had to stay. The court's findings, however, are that at the onset of the interrogation and at many times thereafter the defendant was told that he was free to go. It is difficult to conceive of a reasonable person who would not feel free to leave after being told many times that he could. State v. Northrop, 213 Conn. 405, 415 (1990).
At this juncture two other aspects of the case should be mentioned. Acts of deception by the police which here are the deliberate misstatement that the defendant's wife would be interviewed and the encouragement of the defendant to come to the police station to aid in an investigation did not turn a noncustodial situation into a custodial one for Miranda purposes. Oregon v. Mathiason, supra at 495. And the issuance of Miranda CT Page 2348 warnings as a cautionary measure did not mean that the defendant was in custody. State v. Damon, supra at 155.
 B.
The use of an involuntary statement of a defendant in a criminal trial violates that defendant's right to due process. State v. Kane, 218 Conn. 151, 160 (1991); State v. Shifflett,199 Conn. 718, 727 (1986). As a prerequisite to admissibility, the State must prove that the defendant's statements were voluntarily made. State v. Kane, supra; State v. Madera, 210 Conn. 22, 39
(1989).
Consistently stated as the proper test for voluntariness is whether a review of all of the circumstances surrounding the bringing forth of the statement reveals that the conduct of the police involved was such as to overbear the defendant's will to resist and bring about a statement not freely determined. Stated another way, the ultimate test is whether the statement is the product of the free and unconstrained choice of its maker. If the statement is the product of such choice, it may be used against him; if it is not, the introduction of the statement offends due process. State v. Rosado, supra at 255; State v. Shifflett, supra.
Claimed as reasons for the involuntariness of the defendant's oral and written statements are police deception, a lack of food, a lack of opportunity to consult with a lawyer, problems with vision that made a reading of the written statement difficult and the troopers' use of their own words rather than the defendant's in the written statement. The court finds none of these claims persuasive.
Some additional findings are in order. The evidence demonstrated that no causal relationship existed between the deceptive acts of the troopers and the making of the statements. Before inculpatory statements were made, the defendant knew that the troopers wanted to discuss his actions with the G. children. In the defendant's telephone conversation with his wife, he did not mention any probability of visits by the police. In response to a question from the court, the defendant admitted having read the printed words above the signature line and admitted to having read the statement. The claims concerning denial of access to food and a lawyer are untenable in view of the troopers' several remarks that the defendant was free to leave. Finally, the claim CT Page 2349 of the highly educated defendant that the written statement is involuntary because the language in it is not his becomes sophistic when compared with the correction and addition he made to the statement which showed knowledge of its content. Moreover a writing can be adopted as the statement of a party when signed by him. Practice Book 749(1).
 III.
Under the federal constitution, the State has the burden to prove that the defendant's statements were voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489,92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The defendant's claim is that Article I 8 of the Constitution of Connecticut requires proof by the higher standard of beyond a reasonable doubt. Other than Justice Berdon's dissenting opinion in State v. Stanley,223 Conn. 674, 696 (1992) no authority is cited. Justice Berdon's dissent, however, is contrary to existing state decisional law. See State v. Kane, supra at 160.
 IV.
The State has proven by more than a preponderance of the evidence that the defendant was not in custody when his statements were made and that the statements were made voluntarily. The motion to suppress is denied.
BARNETT, J.